Retail Properties, Inc. v. Commissioner.
Retail Properties, Inc. v. Commissioner
Docket No. 94706.
United States Tax Court
T.C. Memo 1964-245; 1964 Tax Ct. Memo LEXIS 93; 23 T.C.M. (CCH) 1463; T.C.M. (RIA) 64245; September 18, 1964
James B. Lewis and Arthur Kalish, for the petitioner. Robert A. Trevisani, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in petitioner's income tax for the taxable year ended February 28, 1957 in the amount of $43,385.21 and for the taxable period March 1, 1957 to June 11, 1957, in the amount of $363,571.50. The first issue is whether the gain realized by petitioner on the sale of its five parcels of real property is to be recognized. If it is, then an issue exists between the parties as to the amount of gain. Findings of Fact Some of the *96 facts have been stipulated and they are found accordingly. Petitioner was incorporated under the laws of Ohio on February 25, 1929. Petitioner was engaged in the business of holding improved real property in downtown areas of a number of cities in the United States for rental to retail stores. Its principal office was in New York, New York. It filed its income tax returns for the taxable year ended February 28, 1957 and for its taxable period March 1, 1957 to June 11, 1957 with the district director of internal revenue for the Upper Manhattan District of New York. In March 1929 petitioner received $7,125,000 for the following stock and debentures: (a) 20,000 shares of its preferred stock at $46 per share, for a total of $920,000; (b) 160,000 shares of its common stock at $1 per share, for a total of $160,000 (of which 95,000 shares were delivered at that time and 65,000 shares were delivered at a later date under common stock allotment certificates attached to the 5 1/2 percent Debentures); and (c) $6,500,000 in aggregate principal amount of 5 1/2 percent Debentures for a total of $6,045,000 (after subtracting, from the $6,110,000 received from such Debentures, the amount of $65,000 *97 allocable to the common stock allotment certificates attached thereto). On March 5, 1929 petitioner accepted an offer of Otis & Co., a Cleveland investment banking firm, to assign to petitioner all the right, title and interest of Otis & Co. in a contract dated February 25, 1929 between Schulte-United, Inc., a New York corporation, as seller, and Otis & Co., as purchaser, for the purchase of 24 parcels of real property, of which 19 parcels were located in the United States and the remaining five were located in Canada. On March 13, 1929 petitioner organized Schulte-United Properties, Limited (changed to Retail Properties, Limited on May 16, 1931) as a corporation under the laws of Canada. From the time of the organization of the Canadian corporation, hereinafter called Limited, all of its outstanding stock was owned by the petitioner. On March 26, 1929 the said 24 parcels of real property were conveyed to the petitioner. The total purchase price to petitioner of the 24 parcels of real property was $7,125,000, of which $5,240,000 was the purchase price of the 19 parcels of United States real property and $1,885,000 was the purchase price of the five parcels of Canadian real property. *98 On March 26, 1929, pursuant to an agreement of March 20, 1929 between petitioner and Limited, petitioner conveyed the five parcels of Canadian real property to Limited in exchange for all of the outstanding stock of Limited. Limited has at all times been engaged in the business of holding improved real property for rental. From the date of acquisition of the original 19 parcels of United States real property through February 28, 1933, petitioner took depreciation on the improvements, both on its books and on its income tax returns, at the rate of 2 percent per annum. From March 1, 1933 until the dates of disposition of such properties, petitioner took depreciation on the improvements, both on its books and on its income tax returns, at the rate of 2 1/2 percent per annum. From time to time after the issuance of the 5 1/2 percent Debentures, petitioner purchased amounts of such Debentures for redemption and cancellation. By March 1, 1932, petitioner had purchased such Debentures in an aggregate principal amount of $414,000. The principal amount of such Debentures outstanding on March 1, 1932 was thus $6,086,000. Interest on the 5 1/2 percent Debentures through February 28, 1931 was *99 paid by petitioner when due. Petitioner did not pay interest on the 5 1/2 percent Debentures for the period March 1, 1931 to February 29, 1932. The accrued but unpaid interest as of March 1, 1932 on the $6,086,000 in principal amount of 5 1/2 percent Debentures outstanding on that date was, as follows: Interest Due Date
Amount
September 1, 1931
$167,365
March 1, 1932
167,365
Total
$334,730
A proposed plan for refinancing the outstanding 5 1/2 percent Debentures was approved by petitioner's board of directors on January 28, 1932. Pursuant to such plan and under a Trust Agreement dated March 1, 1932 between petitioner and The Guardian Trust Company as Trustee, the petitioner issued $500 in principal amount of new Series "A" Debentures and $600 in principal amount of Series "B" Debentures for each $1,000 principal amount of 5 1/2 percent Debentures (and accrued interest from March 1, 1931 to February 29, 1932) deposited with the trustee. In approving the above refinancing plan, petitioner's board of directors also approved a voting trust agreement for the preferred and common stock of the petitioner. The terms of the Series "A" Debentures provided for the *100 payment of principal on March 1, 1959, with interest at 5 percent payable semiannually. The Series "A" Debentures were redeemable in whole or in part by lot at any time at the option of petitioner upon payment of the principal amounts thereof plus accrued interest. The principal amount of the Series "B" Debentures was payable on March 1, 1959, with interest at 6 percent payable semiannually. The Series "B" Debentures were subject to redemption in whole or in part by lot at the option of petitioner at any time after all the Series "A" Debentures had ceased to be outstanding upon payment of the principal amounts thereof plus accrued interest. Of the $6,086,000 in principal amount of the 5 1/2 percent Debentures outstanding on March 1, 1932, $5,847,000 was exchanged under the refinancing plan during the fiscal year ended February 28, 1933 for $2,923,500 in principal amount of Series "A" Debentures and $3,508,200 in principal amount of Series "B" Debentures. By February 28, 1941, $5,973,000 in principal amount of 5 1/2 percent Debentures had been exchanged for $2,986,500 in principal amount of Series "A" Debentures and $3,583,800 in principal amount of Series "B" Debentures, and the *101 remaining $113,000 of principal amount of 5 1/2 percent Debentures outstanding on March 1, 1932 had been redeemed. During the period August 1, to October 20, 1951, petitioner paid 40 percent of principal on all outstanding Series "B" Debentures tendered to it for that purpose within that period. With respect to those Series "B" Debentures on which such 40 percent principal amounts were made, interest was accrued on the full principal amount to August 31, 1951; thereafter, interest was accrued only on the balance of 60 percent of principal. Petitioner stamped and returned to the holders thereof the Series "B" Debentures tendered for payment of such 40 percent of principal. Approximately 91 percent of the Series "B" Debentures outstanding at the time of such offer were tendered for the purpose of receiving such 40 percent principal payment. Petitioner regularly paid interest on the outstanding Series "A" Debentures when due. However, petitioner made no payment of interest on the Series "B" Debentures until September 2, 1947. Beginning with such date, petitioner paid interest (for prior interest periods) on the Series "B" Debentures outstanding at a rate of 3 percent or 4 percent. *102 From time to time following the issuance of the Series "A" and Series "B" Debentures petitioner (a) made purchases of amounts of such Debentures of both series on the open market for redemption and cancellation and (b) redeemed amounts of Series "A" Debentures at their principal amount plus accrued interest. In each of the taxable years ended February 28, 1943 through February 28, 1955 petitioner retired some of its outstanding Series "A" or Series "B" Debentures at prices below their issue price plus the amount of discount previously deducted plus accrued interest. On its Federal income tax returns for each of such taxable years the petitioner elected to exclude from gross income a portion of the discounts at which it had retired its Debentures during such year. The amount of such discount for which such an election was made was as follows: Year of
Face
Unpaid
Accrued
Purchase
Retirement
Ended
February 28
Value
Principal
Interest
Price
Discount
1943
$ 323,600
$ 323,600
$ 118,860.00
$ 119,017.43
$ 306,820.29
1944
445,300
445,300
293,898.00
141,705.60
554,479.71
1945
289,200
289,200
208,224.00
136,980.50
334,254.83
1946
106,400
106,400
71,222.00
[*] [*] 1947
909,800
909,800
171,199.00
[*] [*] 1948
52,000
52,000
[*] [*] [*] 1949
44,800
44,800
41,052.00
42,665.00
40,211.95
1950
12,000
12,000
11,178.00
12,069.00
10,384.56
1951
97,800
97,800
95,535.00
124,185.61
63,835.59
1952
53,500
33,580
50,933.00
65,895.30
16,995.91
1953
175,100
105,340
169,223.20
216,850.25
53,261.37
1954
56,500
34,140
51,665.60
66,712.50
17,853.47
1955
199,300
120,780
177,611.00
275,794.63
18,950.60
Total
$2,059,300
$1,868,740
$1,507,061.80
$1,483,629.82
$1,757,621.87
*103 From time to time the petitioner purchased properties adjoining certain of the 19 parcels of United States real property acquired by it in March 1929, and from time to time the petitioner sold such original and after-acquired United States properties. The original United States properties still owned by petitioner on February 28, 1942 were as follows: Net Book Value
Original
Cost
of Improve-
Taxable
Improve-
ments on
Year
Location of Property
Land
ments
2/28/42
Sold
Albany, N. Y.
$657,028.00
$242,972
$169,189
6/11/57
Auburn, N. Y.
172,334.00
117,666
81,935
2/28/47
Braddock, Pa.
136,845.00
53,155
37,013
6/11/57
Camden, N. J.
207,054.00
167,946
116,946
2/29/44
Colorado Spring, Colo.
37,254.00
72,746
50,654
6/11/57
Fall River, Mass.
422,539.00
177,461
123,572
2/28/54
Greensburg, Pa.
102,431.50
51,203
2/28/55
167,475.50
73,531
2/28/57
Okmulgee, Okla.
5,108.00
39,892
27,778
2/28/44
Philadelphia, Pa.
162,220.00
62,780
43,716
2/28/49
Puebio, Colo.
122,679.00
57,321
39,914
2/29/44
Northeast corner 4th and Main
St.
Pueblo, Colo.
82,500.00
117,500
81,820
6/11/57
317-325 Main St. (Southwest
corner
4th and Main St.)
Pueblo, Colo.
41,000.00
84,000
58,492
2/28/46
307-309 Main St.
Topeka, Kans.
182,775.00
192,225
133,852
2/29/44
*104 The fair market value of petitioner's real properties and Limited's real properties as of the end of fiscal years 1943 through 1948 were as follows: Fiscal Year
Petitioner
Limited
2/28/43
$2,232,000
$1,333,000
2/29/44
2,180,000
1,192,000
2/28/45
1,700,000
1,208,000
2/28/46
1,805,000
1,288,000
2/28/47
$1,962,000
$1,408,000
2/29/48
1,945,000
1,648,000
The total fair market value of petitioner's assets, the aggregate amount of its liabilities, and the excess of its liabilities over the fair market value of its assets as of the end of the fiscal years 1943 through 1948 were as follows: Excess of Liabilities
Fiscal Year
Assets
Liabilities
over Assets
2/28/43
$3,817,541.02
$7,013,738.70
$3,196,197.68
2/29/44
3,713,030.67
5,654,975.04
1,941,944.37
2/28/45
3,238,095.76
5,092,506.94
1,854,411.18
2/28/46
3,567,521.83
5,042,185.85
1,474,664.02
2/28/47
3,771,815.75
4,364,067.33
592,251.58
2/29/48
3,824,083.24
4,210,016.63
385,933.39
In June of 1956 petitioner held five parcels of real property that it was renting and it also held all of the outstanding stock of Limited. In 1956 Limited still held *105 four of the original parcels of Canadian real estate which petitioner had transferred to it in 1929. In 1956 and 1957 the net value, after reduction for liabilities of Limited's real properties, was in excess of $800,000. Petitioner's authorized capital on June 12, 1956 consisted of 20,000 shares of $3 Dividend Cumulative Convertible Preferred Stock, all of which were issued and outstanding, and 180,000 shares of common stock, of which 154,900 shares were issued and outstanding. The preferred stock was entitled to a liquidating preference of $50 a share plus accumulated but unpaid dividends amounting to $75 a share representing arrearages from January 1, 1931. On June 12, 1956, the common stock as a class was entitled to elect two members and the preferred stock as a class was entitled to elect three members of the five-member board of directors. At the beginning of 1956 a group of stockholders consisting of Leonard Marx and his corporate and individual business associates (hereinafter referred to as the Marx group) held about 43.2 percent of petitioner's preferred stock and 41.3 percent of its common stock. Leonard Marx was president of petitioner and his group had elected a new *106 board of directors. Leonard Marx was of the opinion petitioner's properties located in downtown areas would decline in value because of insufficient parking space for automobiles and the advent of shopping centers. His group wished to liquidate petitioner but The Cleveland Trust Company, owning 28.5 percent of petitioner's preferred stock and 10.3 percent of the common stock, opposed liquidation. Finally an agreement was worked out between The Cleveland Trust Company and the Marx group for the exchange of petitioner's stock held by both to Merchants National Properties, Inc., hereinafter called Merchants. Leonard Marx was president of Merchants but he was not a majority stockholder, and he did not control the board of directors. Merchants was the owner of real estate properties leased to chain stores. After Merchants had acquired stock in petitioner by virtue of the above exchange and also exchanging its stock with other stockholders of petitioner it held on June 4, 1956, 71.5 percent of petitioner's preferred stock and 60.2 percent of petitioner's common stock. On June 12, 1956, at a special meeting of the shareholders of petitioner, there was adopted a plan of complete liquidation, *107 as follows: RESOLVED, that the Plan of Complete Liquidation of the Company, as submitted to this meeting, be, and the same hereby is, approved, authorized and adopted; and IT WAS FURTHER RESOLVED, that pursuant to the said Plan, the proper officers of the Company be, and they hereby are, authorized and directed to enter into, in the name of the Company, and consummate, contracts for the sale of all of the real estate standing in the name of the Company upon such terms and conditions as may be approved by the Board of Directors; and IT WAS FURTHER RESOLVED, that pursuant to said Plan, the proper officers of the Company be, and they hereby are, authorized and directed to convey any real estate which shall stand in the name of the Company after the expiration of ten months from the date of the adoption of these resolutions, at their discretion, either to (a) the Company's Canadian subsidiary, Retail Properties, Ltd., or (b) to such person or persons who shall have been appointed as trustee or trustees by the shareholders of the Company to receive their proportionate share of the distribution of the net assets of the Company upon liquidation and IT WAS FURTHER RESOLVED, that pursuant *108 to said Plan, the proper officers of the Company be, and they hereby are, authorized and directed to sell or otherwise convert to cash all other assets of the Company (except shares of Retail Properties, Ltd. held by the Company) upon such terms and conditions as the Board of Directors may approve and to pay or discharge all of the debts and liabilities of the Company, or set up reasonable reserves for the payment of unascertained or contingent liabilities; and IT WAS FURTHER RESOLVED, that pursuant to said Plan, the proper officers be, and they hereby are, authorized and directed to distribute all of the assets of the Company (less assets retained for the payment of unascertained or contingent liabilities) to the stockholders, either in cash or in kind, in exchange for the surrender and complete cancellation of the Company's stock in accordance with the provisions of the Articles of Incorporation, as amended by the terms of the amendment heretofore submitted to this meeting, within the 12-month period beginning on the date of the adoption of these resolutions, in accordance with the provisions of Section 337 of the Internal Revenue Code of 1954. Prior to *109 the adoption of the foregoing Plan some discussion had been had with prospective purchasers of petitioner's five parcels. Informal agreement had been reached with a prospective purchaser of the property in Greensburg, Pennsylvania, who was told a contract of sale would be executed upon completion of the adoption of the liquidation Plan. This property was sold to said purchaser, an unrelated party, on August 16, 1956 for $250,000. Holders of 3,225 shares of preferred stock and 5,140 shares of common stock dissented from the "Plan of Complete Liquidation" authorized by petitioner's shareholders on June 12, 1956 and on August 27 and September 4, 1956, instituted actions in the Court of Common Pleas of Cuyahoga County, Ohio, for a determination of the fair cash value of their shares. Certain of such stockholders also instituted action in such Court on July 17, 1956, to enjoin the carrying out of such "Plan" and to obtain equitable relief. After extended negotiations, the dissenting stockholders expressed their willingness to accept $52.50 per share for their preferred stock and $1 per share for their common stock. At meetings on May 7 and 9, 1957, the board of directors of petitioner *110 approved the purchase of the stock of the dissenting stockholders at those prices. The court actions described above which were instituted on July 17 and August 27, 1956 were dismissed on May 23, 1957 and the action described above which was instituted on September 4, 1956 was dismissed on June 11, 1957. In connection with the dismissal of those actions, petitioner purchased the 3,225 shares of preferred stock of the dissenting stockholders at $52.50 per share, for an aggregate of $169,312.50, and the 5,140 shares of common stock of such stockholders at $1 per share, for an aggregate of $5,140. Following adoption of the resolutions and prior to June 10, 1957, petitioner also voluntarily purchased 500 shares of preferred stock and 811 shares of common stock from six non-dissenting shareholders. Petitioner had outstanding, on June 10, 1957, 16,275 shares of preferred stock and 148,949 shares of common stock. In May of 1957 Merchants had acquired some additional shares and the purchase and the elimination of dissenting stockholders increased its percentage of ownership to about 85 percent. On June 1, 1957, petitioner conveyed to Limited its remaining four parcels of real property *111 located in Albany, New York; Braddock, Pennsylvania; Colorado Springs, Colorado; and Pueblo, Colorado. Petitioner conveyed such four parcels of real estate to Limited subject to mortgages of $1,200,912.31, and also transferred to Limited $1,475.50 of prepaid insurance. In exchange therefor, Limited (a) paid petitioner $302,778.23 in cash, (b) issued to petitioner $418,320 in face amount of 5 percent 10-year promissory notes of Limited, and (c) assumed nonmortgage liabilities of petitioner aggregating $47,989.27. Petitioner incurred expenses of $3,662 in connection with this transaction. On June 10, 1957, petitioner distributed all of its assets to its stockholders in exchange for their stock, as follows: (a) For each share of preferred stock: 4.437 shares of stock of Limited, $21.27 in face amount of 5 percent 10-year promissory notes of Limited and $8.51 in cash; and (b) For each share of common stock: 0.1043 shares of stock of Limited, $0.50 in face amount of 5 percent 10-year promissory notes of Limited and $0.20 in cash. In lieu of fractional shares of stock of Limited, petitioner distributed cash at the rate of $6 per share. In lieu of fractions of $10 in face amount of *112 the aforesaid promissory notes of Limited, petitioner distributed cash equal to such fractions of face amount. As indicated above, Merchants received about 85 percent of this liquidating distribution. On June 11, 1957, petitioner was dissolved, the certificate of dissolution being filed in the office of the Secretary of State of Ohio on said date. Following the distribution of the 5 percent 10-year promissory notes of Limited by petitioner, Limited purchased varying amounts of such notes on the following dates and at the following prices: Principal
Price per $100
Amount
Principal
Aggregate
Date
Purchased
Amount
Price
9/ 3/57
$ 70
$80
$ 56.60
9/25/57
70
75
52.50
9/28/57
1,510
72
1,087.20
10/ 3/57
20
72
14.40
10/18/57
1,630
70
1,141.00 On December 1, 1957, Limited offered to purchase all of its 5 percent 10-year promissory notes held by persons holding $1,000 or less in principal amount of such notes, at 75 percent of principal amount. On the same date (December 1, 1957), Limited made a semi-annual principal payment of $20,751 on the $415,020 principal amount of such notes then outstanding. From December 1, 1957 to February 28, 1958, Limited, *113 pursuant to its offer of December 1, 1957, purchased, at 75 percent of principal amount, $4,161 in aggregate principal amount of such notes. None of the foregoing purchases were made from Merchants. As a result of the foregoing purchases and the semiannual principal payment made on December 1, 1957, the principal amount of such notes outstanding on February 28, 1958 was $390,108. On March 27, 1958, the directors of Limited resolved that Limited redeem all of its then outstanding 5 percent 10-year promissory notes in an original principal amount of $1,000 or less on June 1, 1958, and that all interest on such notes should cease as of the latter date. The aggregate principal amount of 5 percent 10-year promissory notes of Limited outstanding at the end of its fiscal years ended February 28, 1959 through February 28, 1962 was as follows: Principal Amount
Date
Outstanding
February 28, 1959
$333,191.50
February 29, 1960
293,992.50
February 28, 1961
$ 91,773.50
February 28, 1962
77,654.50
In its income tax return for the taxable year ended February 28, 1957, petitioner reported the sale of the Greensburg property, as follows: Other nontaxable income
Book Basis
Tax Basis
Land and building - Greensburg, Pa. - cost
$216,231.35
$136,292.16
Less: accumulated depreciation to date of sale
24,618.87
22,535.77
Net book value at date of sale - 8/16/56
$191,612.48
$113,756.39
Add: expenses in connection with sale
2,775.00
2,775.00
$194,387.48
$116,531.39
Sales price
$250,000.00
$250,000.00
Gain on sale
$ 55,612.52
$133,468.61
(Gain non-taxable under plan of liquidation filed June 12, 1956)
*114 In his notice of deficiency for the above year respondent determined $133,468.61 constituted additional income to petitioner, explaining: Capital gain of $133,468.61 derived from the sale of real property located at Greensburg, Pa., is deemed to be includable in the determination of taxable income. In its income tax return for the taxable period March 1, 1957 to June 11, 1957, petitioner reported the sale of the four parcels of realty to Limited, as follows: RETAIL PROPERTIES, INC.
June 11, 1957
Real Estate Sold to Retail Properties, Ltd. on June 1, 1957
Consideration received
Cash
$ 302,778.23
Notes of Retail Properties, Ltd. (at par value)
418,320.00
Liabilities assumed by Retail Properties, Ltd.
47,989.27
$ 769,087.50
Less: Prepaid insurance acquired by Retail
Proper-
ties, Ltd.
1,475.50
$767,612.00
Book value of real estate sold
Book value of properties
$1,769,412.20
Less: Reserve for depreciation
373,580.75
$1,395,831.45
Less: Mortgages assumed by Retail Properties,
1,200,912.31
194,919.14
Ltd.
$572,692.86
Expenses in connection with sale
Realty transfer stamps
$ 3,645.00
Recording Fees
17.00
3,662.00
Non-taxable gain on sale
$569,030.86
The stockholders adopted a plan of liquidation on June 12, 1956 and the
taxpayer-corporation made its final distribution in liquidation on June 10,
1957. The taxpayer dissolved on June 11, 1957. No gain nor loss is recognized
on the sale of theabove properties pursuant to section 337 of the Internal
Revenue Code of 1954.
*115 Respondent determined the gain on such sales to Limited to be $1,454,285.99 [1] and determined this sum constituted additional income to petitioner, explaining: Capital gain of $1,454,285.99 derived from the transfer of four parcels of real estate to Retail Properties, Ltd., is deemed to be includable in the determination of taxable income. In its original petition filed in this case petitioner alleged its gain realized on the sale of the four parcels of realty to Limited "did not exceed $986,397.20." In its amended petition petitioner asserted its gain on the sale of the four parcels of realty to Limited $55,612.52 and its gain on the sale of the remaining four parcels to Limited was $443,534.86. Of course, both pleadings allege the amount of gain realized *116 on both sales is not to be recognized. Opinion It is admitted petitioner realized gain from the sale of all five of its properties. Section 1002, Internal Revenue Code of 1954, [2] provides: Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized. Petitioner contends its gains were realized in sales made pursuant to an adopted plan of liquidation followed by complete distribution within one year and petitioner relies entirely on section 337 to shield its gain, arising from the sale of all five of its properties from recognition. [3]
*117 It is respondent's argument that the gain arising from the sale of the Greensburg property and the conveyance of petitioner's four remaining parcels of realty to its wholly-owned subsidiary should be fully recognized under the provisions of section 1002 and he contends that "[the] provisions of section 337 do not operate to prevent the recognition of gain." Respondent's entire argument boils down to a contention that the legal effect of petitioner's sale of most all of its operating assets to its wholly-owned subsidiary, followed by the distribution of its assets, including the subsidiary's stock, to petitioner's shareholders, constitutes a reorganization within the meaning of section 368(a)(1)(D). [4]
*118 Generally speaking, the statutes with respect to transfers made pursuant to reorganization are also designed to prevent recognition of gain at the corporate level when, following such a transfer, there is distribution of the money received pursuant to the reorganization plant. Section 361(a)(b)(1)(A). [5]
There is, however, a difference between nonrecognition of gain *119 at the corporate level between liquidation sales and reorganization transfers. If one of the corporations to a reorganization is a foreign corporation then (under section 367 set forth below) [6] gain will be recognized unless before the exchange a ruling is secured from the Commissioner that the exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. Since Limited was a Canadian corporation, petitioner's gain will be recognized if its transaction with Canadian constitutes a reorganization. The absence of a favorable section 367 ruling from the Commissioner is here admitted. *120 The question of whether or not a corporation distributes all of its assets in liquidation or transfers them pursuant to a plan of reorganization is one of fact to be determined from a consideration of all parts of the transaction together rather than separately. Pridemark, Inc., 42 T.C. 510, and cases cited. And the fact that there was an adopted plan of liquidation which was carried out is not determinative of the issue of whether there was a reorganization. If the transaction viewed in its entirety results in a transfer by a corporation of all or part of its assets to another corporation and immediately after the said transaction the transferor or its shareholders or both are in control (defined to mean at least 80 percent stock ownership) of the transferee, then a section D reorganization has been accomplished. See Richard H. Survaunt, 5 T.C. 665, where we said: "The liquidation of the old company then assumes the character of only one step in an integrated transaction." If petitioner's assets were transferred to a newly-organized corporation with substantially the same shareholders, and the business continued and the old corporation liquidated, there *121 would be no question that a reorganization would have occurred. We see no reason why the same rule should not prevail when the transferee corporation is not newly organized so long as it is controlled by the transferor or its shareholders. In Estate of Elise W. Hill, 10 T.C. 1090, where it was held a reorganization was effected, the transferee corporation was an inactive one that the shareholders of transferor had formed some 16 years before the transaction that was held to be a reorganization. It is obvious here that the required section D control of transferor and transferee existed. Immediately after the four parcels were transferred to Limited, the transferor was Limited's sole shareholder. It would seem that that fact alone would be sufficient to satisfy the control requirement. However, petitioner argues that whether the requisite control existed must be determined by reference to the holding of the Limited stock by Merchants and the other stockholders of petitioner as a result of the distribution, and not the holding of that stock by petitioner during the nine-day interval between the transfer and the liquidation distribution. Petitioner cites cases such as *122 Frank W. Williamson, 27 T.C. 647, and Ericsson Screw Machine Products Co., 14 T.C. 757, where we have held claimed statutory reorganizations failed because at the conclusion of the entire transaction neither the transferor corporation nor its shareholders or both were in control of the transferee. It is obvious that even if applicable, this line of cases would not advance petitioner's cause. It would still leave the stockholders of petitioner in control of Limited at the conclusion of the entire transaction. But, petitioner argues, Merchants' stockholding does not count for the purpose of the control requirement since it had what petitioner terms a "transitory stockholding." Petitioner cites a number of cases decided under special factual patterns where the chief or only purpose was to have a corporation acquire another corporation's assets. When this could only be accomplished by purchasing its stock and liquidating it, then it has been held such stockholding will not count for the purpose of the control requirement. Estate of James F. Suter, 29 T.C. 244; Commissioner v. Ashland Oil & Refining Co., 99 F. 2d 588. We distinguished *123 those cases in John Simmons Co., 25 T.C. 635, at p. 642, by saying: "In those cases the acquiring corporation had no purpose of continuing the business of the old corporation in a new corporate form." Merchants was not a transitory stockholder within the rule of such cases. It was not seeking to secure the operating assets of petitioner. It evidently, at least at the time of transfer, wanted Limited to secure those assets and judging by what occurred, wanted Limited to continue petitioner's rental business. Petitioner argues that its transaction with Limited fails to qualify as a section D reorganization because the stock of the transferee, Limited, was not, as required by said section, "distributed in a transaction which qualifies under section 354, 355, or 356." It is admitted the transaction does not qualify under section 355 which has to do with divisive reorganizations. Section 356 is concerned only with transactions in which boot is received in a transaction otherwise qualifying under section 354 or 355. It is petitioner's argument the distribution of Limited stock did not qualify under section 354(b)(1)(A) which provides in effect that section 354 "shall not apply *124 to an exchange in pursuant of" a "D" reorganization "unless * * * the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets." It is petitioner's contention that Limited did not "acquire substantially all of the assets" of petitioner in that it did not acquire its own stock having a value of at least $800,000. It only acquired the four parcels of realty having a net value, less mortgage liabilities, of about $643,000. Whether [*] was a [*] of "substantially all" of a corporation's assets within the meaning of that term in this statute depends upon the special facts of each case. John G. Moffat, 42 T.C. 558. It is not determined by merely applying a percentage of total assets test. Petitioner's only operating assets were five parcels of rental realty. Where it transferred four of them to its subsidiary, we feel the "substantially all" requirement was met. The assets transferred were ample to accomplish the continuance of the rental business petitioner had carried on before the transfer. The fact that such a nonoperating asset as 50 shares of stock in Limited was retained for the liquidation distribution *125 is immaterial. John G. Moffat, supra, and cases cited. Petitioner argues its transfer of real estate to Limited was a sale for cash and short term notes and therefore it could not be a transfer in reorganization. If petitioner is arguing the reorganization statutes do not contemplate sales or transfers for consideration, it is mistaken. Section 361, previously quoted, shows that transfers for stock, securities, or money were clearly contemplated. In fact, the design of the reorganization statutes is that they would apply to gainful sales and in general prevent recognition of the gain when there exists a continuing business interest under modified corporate form. Petitioner cites a number of cases [7] where the consideration for the transfer was generally cash, or cash and notes of the transferee and the determination of whether it was a reorganization or not depended upon whether the transferor acquired the requisite interest in the affairs of the transferee. If the transferor did not acquire such interest the transaction was called a sale and not a reorganization. Such cases are not in point. At all times material here both before and after the transfer petitioner was *126 Limited's sole stockholder and Merchants was petitioner's 80 percent stockholder. Petitioner seems to argue a section "D" reorganization cannot be effected unless the control of the transferee by the transferor is acquired in the transfer transaction. There is nothing in the statute to that effect. It is the existence of the control over the transferee by the transferor or its shareholders [*] after the transfer that is required. And this requirement is satisfied if the transfer is to transferor's wholly-owned subsidiary. Some argument is made that here there was no plan of reorganization. Such a plan need not be written. Ethel K. Lesser [Dec. 21,743], 26 T.C. 306. Actually here the plan that was called a plan of complete liquidation encompassed accomplishment of a reorganization. It expressly allowed the sale of operating assets to its subsidiary and forbad the sale of subsidiary stock. One could hardly conceive of a more perfect plan to accomplish the post-transfer survival of the transferor's business and continuance of identity *127 of ownership. Marx testified that at the time of the adoption of the plan in June of 1956, the plan was to sell all of the parcels to outsiders and this was prevented by the dissident stockholders' suits which were not settled until too late (in the one-year period) to secure advantageous sales to outsiders. This is merely a reason why petitioner did not liquidate and decided to reorganize instead. It is somewhat significant that Limited is still the owner of and receiving rental income from the four parcels it secured from petitioner in 1957. Cf. Morley Cypress Trust, Schedule "B", 3 T.C. 84. We hold that viewing all parts of petitioner's transaction with its subsidiary and considering them all together, petitioner effected a section D reorganization and a continuance of the same business under the same business interests rather than a complete liquidation under section 337. It is therefore our conclusion that the gains realized by petitioner in the sale of the Greensburg property in 1956 and the remaining four parcels in 1957 are to be recognized. We turn now to the second proposition and a consideration of the amount of gain petitioner realized in the sales involved. *128 In determining the gain realized by petitioner from the sale of the Greensburg property and the sale of the four parcels of real property in the respective amounts of $133,468.61 and $1,454,285.99, the respondent apparently used an adjusted basis of $113,756.39 for the Greensburg property and $510,576.32 for the remaining four parcels of realty. Petitioner argues that the computation of gain was incorrectly computed because (1) the respondent overstated the amount realized on the sale of the four parcels of realty to Limited by including in such amount the promissory notes received from Limited in their full face amount ($418,320) and (2) the adjusted basis of all the properties sold was understated. Respondent now admits that he understated the basis of the properties to some extent. Section 1001(b) of the Internal Revenue Code of 1954 provides that the "amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received." Petitioner contends that the 5 percent 10-year promissory notes of Limited had a fair market value when received of 70 percent of *129 their face amount of $418,320. Petitioner has the burden of showing that the value of these notes was anything less than their face amount. The only witness on this point was Leonard Marx, petitioner's president in 1957, who merely stated that the figure to be used was 70 percent of face value. There was also evidence of a very few purchases of notes made by Limited in September and October 1957, [8] but such isolated sales, in insignificant amounts, do not give a reliable indication of value. Certainly there is nothing in the record to indicate that Limited suffered from any financial weakeness which would impair the value of its securities and, in fact, we would infer the contrary both from its profitable operations in 1956 and 1957 and from the net value of its assets. The record also indicates that the notes have been honored by Limited both as to principal and interest, and by February 28, 1962 the principal amount of notes outstanding was $77,654.50. We do not believe that, on the basis of the record, the petitioner has met its burden *130 of showing that the fair market value of the 10-year promissory notes it received in 1957 as part of the consideration for the sale of its properties to Limited was less than their face value. In each of the taxable years ended February 28, 1943 through February 28, 1955 petitioner retired some of its outstanding debentures at a discount. On its income tax returns for each of those years petitioner elected, under sections 22(b)(9) and 113(b)(3) of the Internal Revenue Code of 1939 and sections 108(a) and 1017 of the Internal Revenue Code of 1954, [9] to exclude from gross income any income resulting from the discharge of indebtedness and to make corresponding reductions in the basis of its property held in the year when the discharge occurred. It is stipulated that the total amount of discount for which petitioner had made such elections for such taxable years was $1,757,621.87. *131 Petitioner states on brief that it computed the required basis adjustments to its property "by simply treating as income from cancellation of indebtedness the entire amount by which (a) the unpaid principal (less unamortized discount) plus accrued but unpaid interest on the specified debentures exceeded (b) the purchase price of the debentures." Petitioner now contends that this computation was incorrect in two respects: (1) it included as income items of interest previously accrued and discount previously amortized without tax benefit, and (2) it included as income amounts relating to cancellation of indebtedness during the taxable years ended February 28, 1943 through February 29, 1948, when petitioner was purportedly insolvent. Respondent recognizes that income does not result from the discharge of indebtedness when the discharge represents an item previously deducted without tax benefit or when the discharge does not make assets available to the debtor. [10] But respondent disputes the petitioner's application of these principles to the facts of this case. *132 Respondent disagrees with petitioner's contention that it was insolvent (i.e., its liabilities exceeded the fair market value of its assets) in each of the fiscal years ended February 28, 1943 through February 29, 1948. The only question respondent raises is the correctness of the fair market value of petitioner's real properties and its stock in Limited. Petitioner's witness, George Moran, testified as to the fair market value of the various parcels of real estate owned by petitioner in the United States and by Limited in Canada. The fair market value of the Limited properties was determined in order to establish a value for the stock in Limited which was all owned by petitioner. See Estate of Henry E. Huntington, 36 B.T.A. 698. The witness' appraisals were based on, among other factors, location of the properties, rentals, terms of leases, physical history of the properties, and in some instances, when properties were sold by petitioner, the actual sales price. The witness was a licensed real estate broker and professional appraiser who had dealings with this type of business property on a national scale. Apart from his testimony and the supporting exhibits, there *133 is nothing else in the record bearing upon the value of these properties. Respondent did not offer any contradictory evidence, but merely offers certain arguments, speculative in nature, which we have considered and do not find persuasive. On this record we feel we must accept the petitioner's fair market values of its real properties in the United States and its stock in Limited (supported by the fair market values of Limited's properties in Canada). We have made findings of fact as to the total fair market value of petitioner's assets and its liabilities for its fiscal years ended February 28, 1943 through February 29, 1948, and such totals indicate that in each of the fiscal years the liabilities exceeded the fair market value of the petitioner's assets. Petitioner's insolvency in those years must be taken into account in the Rule 50 computation in computing its income from the cancellation of indebtedness in the respective years. It is clear that any computation of gain from the discharge of an obligation must be based upon the original issue price rather than the face value of the obligation. Kramon Development Co., 3 T.C. 342. Moreover, when a refinancing occurs *134 and new obligations are substituted for the old, we must refer back to the original issue price of the old obligations to determine whether gain has been realized from the subsequent discharge of the new obligations. See Fashion Park, Inc., 21 T.C. 600. Petitioner sums up its formula for computing gain on the discharge of its obligations as follows: The issuer realizes cancellation of indebtedness income to the extent that the retirement price is less than the sum of (a) the amount received on the issuance of the debentures, plus (b) the amount of discount amortization deducted in prior years which resulted in a tax benefit, plus (c) the amount of accrued but unpaid interest deduction of which in prior years resulted in a tax benefit. Respondent objects to the inclusion of amortized discount in the above formula. We can perceive no valid reason for treating bond discount differently from accrued but unpaid interest. Respondent's reliance upon certain language in his regulations (Regs. 118, sec. 39.22(b)(12)-1) is misplaced, since the purpose of such language in the regulations is evidently to give effect to decisions of the United States Supreme Court holding that the *135 tax benefit rule was inapplicable to deductions for depreciation or depletion. Virginian Hotel Corp. of Lynchburg v. Helvering, 319 U.S. 523; Douglas v. Commissioner, 322 U.S. 275. We also agree with petitioner that, in computing the amount of accrued but unpaid interest on the new Series "A" and Series "B" Debentures, effect must be given to the accrued but unpaid interest on the old 5 1/2 percent Debentures, which interest was, in effect, incorporated under the refinancing plan in the new Series "A" and "B" Debentures. We agree with respondent that the amounts paid by petitioner in retiring its indebtedness must be allocated between (1) the principal debt less unamortized discount, and (2) unpaid interest. In Warner Co., 11 T.C. 419, the Court held that such an allocation was required where a unit payment was made to liquidate an entire debt, including interest. We see no reason to depart from this approach. Since the record shows that interest on the Series "A" Debentures (but not on the Series "B" Debentures) had been paid currently, an allocation must also be made, where necessary, between Series "A" and Series "B" Debentures. This is *136 so because any amount allocated to the Series "A" Debentures will not (in the absence of any accrued but unpaid interest) be subject to the tax benefit rule. We believe we have treated the various arguments and objections of the parties in sufficient fashion to permit an arithmetical computation under Rule 50 of the gain realized by petitioner in the discharge of its obligations during the years here involved. Such gain, if any, will, of course, be employed in reducing the adjusted basis of the real properties here involved for the purpose of determining the gain realized upon the transfer of such properties. Section 113(b)(3) of the Internal Revenue Code of 1939 and section 1017 of the Internal Revenue Code of 1954, which provide that income from cancellation of indebtedness excluded by election from gross income shall be applied to reduce the basis of the taxpayer's property, leave to regulations and formulation of rules for determining the particular properties to which the reduction shall be allocated. See Regs. 111, sec. 29.113(b)(3)-1; Regs. 118, sec. 39.113(b)(3)-1; and sec. 1.1017-1, Income Tax Regs. The regulations set *137 out the specific properties or the categories of assets which must undergo basis reductions, and the regulations also give the sequence in which these adjustments must be made. Section 1.1017-1, Income Tax Regs., [11] provides that the first basis adjustment will be made as follows: § 1.1017-1 Adjusted basis; discharge of indebtedness; general rule. * * *
(1) in the case of indebtedness incurred to purchase specific property (other than inventory or notes or accounts receivable), whether or not a lien is placed against such property securing the payment of all or part of such indebtedness, which indebtedness shall have been discharged, the cost or other basis of such property shall be decreased by an amount equal to the amount excluded from gross income under section 108(a) and attributable to the discharge of the indebtedness so incurred with respect to such property; * * *
The debentures retired by petitioner in the election years were issued in a refinancing of the 5 1/2 percent Debentures originally issued by petitioner in March 1929. The 5 1/2 percent Debentures *138 had been issued at approximately the same time as petitioner's preferred and common stock in exchange for an aggregate consideration of $7,125,000. Petitioner then paid $7,125,000 for its original 24 parcels of real property, including the five parcels of Canadian real property. On the same day (March 26, 1929) the 24 parcels of real property were conveyed to it, the petitioner reconveyed the five Canadian parcels to Limited in return for all of Limited's stock. Consequently, petitioner contends that the indebtedness represented by the specified debentures must be regarded as having been "incurred to purchase" the original 19 parcels of United States real property and the outstanding stock of Limited, and that under the appropriate regulations any reductions in basis resulting from the discharge of indebtedness represented by the debentures be applied against such of the original real property and stock as may have been on hand as of the first day of the fiscal year in which the discharge occurred. We agree with petitioner. Under these facts, it seems to us that the Limited stock may be regarded as the "specific property" within the meaning of the regulations. The basis of such stock, *139 received in return for a transfer of property to a corporation, is the same as the basis of the transferred property. We think the relationship between the Canadian parcels acquired with the borrowed proceeds in 1929 and the Limited stock which afterwards, for all intents and purposes, was substituted for such Canadian real property, is sufficiently close so that we may treat the stock as the "specific property" within the intent of the statute and the regulations. [12] Respondent makes no persuasive argument for compelling a contrary result. A recomputation of the adjusted bases of the various properties can be made under Rule 50. Decision will be *140 entered under Rule 50. Footnotes
1. Respondent used an adjusted basis in the properties of $510,576.32, which figure was traceable to information in petitioner's tax returns. Other figures used in respondent's computation were obtained from petitioner's books or tax returns. Since respondent admits on brief "to some extent the adjusted basis of the properties as set forth in the statutory notice was understated" we need not pursue his computation here.↩
2. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
3. SEC. 337. GAIN OR LOSS ON SALES OR EXCHANGES IN CONNECTION WITH CERTAIN LIQUIDATIONS. (a) General Rule. - If - (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and (2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.↩
4. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (a) Reorganization. - (1) In General. - For purposes of parts I and II and this part, the term "reorganization" means - * * *
(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer) or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356; * * *
(c) Control. - * * * the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.↩
5. SEC. 361. NONRECOGNITION OF GAIN OR LOSS TO CORPORATIONS. (a) General Rule. - No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization. (b) Exchanges Not Solely in Kind. - (1) Gain. - If subsection (a) would apply to an exchange but for the fact that the property received in exchange consists not only of stock or securities permitted by subsection (a) to be received without the recognition of gain, but also of other property or money, then - (A) if the corporation receiving such other property or money distributes it in pursuance of the plan or reorganization, no gain to the corporation shall be recognized from the exchange, * * *↩
6. SEC. 367. FOREIGN CORPORATIONS. In determining the extent to which gain shall changes described in section 332, 351, 354, 355, 356, or 361, a foreign corporation shall not be considered as a corporation unless, before such exchange, it has been established to the satisfaction of the Secretary or his delegate that such exchange is not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income taxes. For purposes of this section, any distribution described in section 355 (or so much of section 356 as relates to section 355) shall be treated as an exchange whether or not it is an exchange.↩
7. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462; Le Tulle v. Scofield, 308 U.S. 415↩.
8. Limited purchased a total of $3,300 in face amount of notes for an aggregate price of $2,351.70 (about 71 percent of face amount).↩
9. The sections under the 1939 I.R.C. are substantially similar to their respective counterparts in the 1954 I.R.C.
Section 22(b)(9) of the 1939 I.R.C. provides as follows: SEC. 22. GROSS INCOME. * * *
(b) Exclusions from Gross Income. - The following items shall not be included in gross income and shall be exempt from taxation under this chapter: * * *
(9) Income from Discharge of Indebtedness. - In the case of a corporation, the amount of any income of the taxpayer attributable to the discharge, within the taxable year, of any indebtedness of the taxpayer or for which the taxpayer is liable evidenced by a security (as hereinafter in this paragraph defined) if the taxpayer, at such time and in such manner as the Secretary by regulations prescribes, makes and files its consent to the regulations prescribed under section 113(b)(3) then in effect. In such case the amount of any income of the taxpayer attributable to any unamortized premium (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be included in gross income and the amount of the deduction attributable to any unamortized discount (computed as of the first day of the taxable year in which such discharge occurred) with respect to such indebtedness shall not be allowed as a deduction. As used in this paragraph the term "security" means any bond, debenture, note, or certificate, or other evidence of indebtedness, issued by any corporation. Section 113(b)(3) of the 1939 I.R.C. provides as follows: SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. * * *
(b) Adjusted Basis. - The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided. * * *
(3) Discharge of Indebtedness. - Where in the case of a corporation any amount is excluded from gross income under section 22(b)(9) on account of the discharge of indebtedness the whole or a part of the amount so excluded from gross income shall be applied in reduction of the basis of any property held (whether before or after the time of the discharge) by the taxpayer during any portion of the taxable year in which such discharge occurred. The amount to be so applied (not in excess of the amount so excluded from gross income, reduced by the amount of any deduction disallowed under section 22(b)(9)) and the particular properties to which the reduction shall be allocated, shall be determined under regulations (prescribed by the Commissioner with the approval of the Secretary) in effect at the time of the filing of the consent by the taxpayer referred to in section 22(b)(9)↩. The reduction shall be made as of the first day of the taxable year in which the discharge occurred except in the case of property not held by the taxpayer on such first day, in which case it shall take effect as of the time the holding of the taxpayer began.
10. In Texas Gas Distributing Co., 3 T.C. 57, the latter principle was stated as follows: Where an insolvent debtor turns over all or part of his property to his creditors in full or partial satisfaction of his debts, if the debtor remains insolvent he realizes no taxable gain. On the other hand, where an insolvent debtor, by reason of the transaction in question, becomes solvent he realizes taxable gain in the amount of the assets freed from the claims of creditors, i.e., to the extent by which the transaction renders him solvint.↩
11. The regulations under the I.R.C. of 1939 are substantially similar.↩
12. If a corporation were to incur an indebtedness to purchase a single piece of property, which was then transferred to a newly formed subsidiary, leaving the transferor with the subsidiary's stock as its only asset, it would seem that, upon a subsequent discharge of that indebtedness at a discount, the corporation would be compelled to reduce the basis of such stock upon electing not to include in its income the gain realized from such discharge. A contrary result would defeat the purpose of the statutory scheme in this area.↩