WARSAW PHOTOGRAPHIC ASSOCIATES, INC., PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2113–79.     Filed January 14, 1985.

*Robert A. Jacobs, Nicholas J. Creme,* and *Lewis Kurfist,* for the petitioner.

*Richard M. Campbell* and *Kevin C. Reilly,* for the respondent.

CHABOT, *Judge*: Respondent determined deficiencies in Federal corporate income tax against petitioner for its taxable years ended June 30, 1974,[1] June 30, 1975, and June 30, 1976, in the amounts of $70,040, $58,239, and $34,685, respectively.

After concessions by both sides, the issues for decision are as follows:

(1) Whether a transaction involving a transfer of assets to petitioner qualifies as a reorganization under section 368(a)(1)(D),[2] thereby entitling petitioner to succeed to the transferor's net operating losses under section 381(a)(2), and giving petitioner a carryover basis (under sec. 362) in the assets acquired from the transferor.[3]

---

[1] Unless indicated otherwise, all references to taxable years are to petitioner's fiscal years ended June 30.

[2] Unless indicated otherwise, all section, subchapter, and chapter references are to sections, subchapters, and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue.

[3] In his answer, respondent concedes that if we conclude that the transfer qualifies as a D reorganization, then there are no deficiencies for petitioner's taxable years 1974 and 1975. As to petitioner's taxable year 1976, however, respondent raises a new matter in his answer. Respondent asserts that the net operating loss claimed in fiscal year 1976 "fails to qualify as a net operating loss carryover under section 381." At trial, respondent conceded this new matter.

(2) If the transfer does not qualify as a reorganization, then whether petitioner is entitled to increase its bases in the assets transferred to it, on account of the fair market value of its shares issued in connection with the transfer.

(3) Whether legal fees incurred by petitioner in acquiring Studios' assets are organizational expenses, and whether petitioner made an election under section 248 to amortize them.

(4) Whether petitioner must amortize the price of a covenant not to compete over its stated term, 6 years, or over the shorter period in which the total actual payment was made, 31 months.

### FINDINGS OF FACT

Some of the facts have been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner's principal office was in New York, NY.

### *Transfer of Assets*

From 1935 or earlier, Warsaw Studios, Inc. (hereinafter sometimes referred to as Studios),[4] and its predecessors were engaged actively in the commercial photography business. Studios was so engaged until July 2, 1973. Studios' principal business was photography for sales catalogues; its clients included Sears, Roebuck & Co., Spiegel, Montgomery Ward, J.C. Penney, and Avon.

A certificate of incorporation for Studios was filed with the New York Department of State on June 30, 1964. Amendments to this certificate of incorporation were filed on December 28, 1964, and June 30, 1965. By the amendment filed June 30, 1965, Studios increased the number of its authorized shares by 5,250 shares, making the aggregate number of authorized

---

[4]At a special meeting of Studios' board of directors, on June 27, 1973, the directors agreed to amend the certificate of incorporation to reflect a change in Studios' name to "WRSW, Inc." This was done in order to allow Pegasus Studio, Ltd., a corporation organized by 10 of Studios' record shareholders and the predecessor of petitioner, to change its name to "Warsaw Photographic Associates, Inc.," under New York corporate law and not be in conflict with the name of Studios (i.e., the use of "Warsaw" by both Studios and Pegasus Studios, Ltd., might be considered a conflict). See note 13 *infra*, and the text preceding note 9 *infra*.

shares 15,500. This amendment further provides that 15,000 of these shares are common shares with $1 par value. The remaining 500 shares are cumulative preferred with $1,000 par value. The cumulative dividends are at the rate of 3 percent, annually. Before any dividend may be declared for common shareholders for a year, Studios would have to pay a 2-percent dividend to the preferred shareholders for that year, in addition to the cumulative 3-percent dividend to the preferred shareholders.

As of July 1, 1965, Studios had 325 outstanding shares of preferred stock, which had a total par value of $325,000. Warsaw & Co., Inc., a corporation owned solely by J.J. Warsaw,[5] was the record owner of all of Studios' preferred stock.

By the end of July 1965, Studios' common stock was owned as set forth in table 1.

TABLE 1

| Owner | Number of common shares |
|---|---|
| Warsaw & Co., Inc | 7,549 |
| Paul Diethelm | 375 |
| Woodbury Prentiss | 250 |
| Gilbert S. Shawn | 250 |
| Donald Riley | 200 |
| Kyril Bromley | 172 |
| John Basilion | 162 |
| James McFarline | 155 |
| James V. Oliver | 142 |
| Joseph G. Lewandowski | 134 |
| Albert T. Warsaw | 128 |
| David Martin | 128 |
| Stephen Warsaw | 88 |
| Richard Dennis | 175 |
| Winfield S. Sinn, Jr | 92 |

The shares owned by Albert T. Warsaw were repurchased by Studios; his stock certificate was canceled on March 17, 1970. The shares owned by Kyril Bromley were redeemed on or about April 19, 1973.

[5] J.J. Warsaw was also the chairman of the board of directors of Studios. He became physically incapacitated in 1973 when he suffered a stroke; he was not mentally incapacitated.

The shares owned by Paul Diethelm and Woodbury Prentiss were transferred to William J. Zad and Stephen Neil, respectively, on or about June 1, 1973.[6]

James McFarline and Stephen Warsaw stopped being shareholders before June 27, 1973.[7]

The following Studios shareholders were also employees of Studios: Gilbert S. Shawn; H. Donald Riley; John Basilion; James V. Oliver; Joseph C. Lewandowski; David Martin; Winfield S. Sinn, Jr.; William J. Zad; Richard Dennis; and Stephen Neil. These shareholders are hereinafter sometimes referred to individually as: "Shawn", "Riley", "Basilion", "Oliver", "Lewandowski", "Martin", "Sinn", "Zad", "Dennis", and "Neil", respectively, and hereinafter sometimes referred to collectively as "the 10 shareholders".

Studios leased office space at two locations in Manhattan, NY. One of these locations was in a building known as 183 Madison Avenue and 40 East 34th Street. The lease (hereinafter sometimes referred to as the 34th Street lease) for this space was for a term of 10 years and 5 months, to begin May 1, 1970, and to continue through September 30, 1980. The 34th Street lease was a standard form of office lease requiring Studios to pay a base annual rent of $17,800, plus, among other things, the following:

1. Additional rent equal to 1.5 percent of the increase in real estate taxes levied or imposed by the State or local governments, over the taxes "assessed for the tax year 1970/1971."

2. Additional rent equal to 1.5 percent of the increase in the amount of the building payroll and cleaning expenses, over such expenses for the calendar year 1970.

3. Additional sums for increases in the Lessor's cost of supplying electricity. This was to take the form of an increase in the annual base rent.[8]

---

[6]Studios' stock certificate book contains forms indicating these transfers. The forms upon which these transfers are recorded do not recite whether any consideration was given, and the parties do not enlighten us on this matter.

[7]These shareholders, who were listed as record owners of shares of Studios' common stock in the stock book, did not sign a unanimous consent of "all of the shareholders" of Studios dated June 27, 1973. Thus, we presume that sometime before June 27, 1973, these persons ceased being shareholders of Studios. The parties do not enlighten the Court as to how this happened—i.e., redemption or sale. Consequently, we do not make a finding as to the total number of outstanding shares of common stock on the date of the transfer of assets from Studios to petitioner.

[8]The lessor reserved the right to discontinue furnishing electricity. If the lessor exercised this right, the lease was to continue in effect, the rent was to be reduced, and the lessee (Studios) was to arrange to get electricity from the public utility company.

Studios, as a lessee, had the right to sublease the office space during the term of the lease, but only with the lessor's consent. If Studios were to default, then all of the rent for the remaining term of the 34th Street lease would become due (reduced by any amounts received by the lessor if the lessor chose to relet the space).

In connection with the 34th Street lease, Studios obtained an irrevocable letter of credit issued by the Irving Trust Co. (hereinafter sometimes referred to as the bank) to Cross & Brown Co., the lessor under the 34th Street lease, in the amount of $100,000. J.J. Warsaw personally guaranteed this liability.

The other office space location was in a building known as 36 East 31st Street. Studios entered into three leases (hereinafter sometimes referred to as the 31st Street leases) with the 443 Fourth Avenue Corp. for various parts of the building, as reflected in table 2.

TABLE 2

| Leased space | Lease Term | | Annual rent |
| | Beginning | Ending | |
| --- | --- | --- | --- |
| Store, mezzanine, and basement | 10/1/70 | 1/31/76 | $50,000 |
| Front portion of fourth floor | 10/1/70 | 1/31/76 | 13,000 |
| Rear portion of fourth floor | 2/ 1/71 | 1/31/76 | 12,000 |

Studios employed relatives and a friend of J.J. Warsaw. Also, Studios had on its payroll the captain of a yacht which J.J. Warsaw owned and used for entertaining. Studios had sustained net operating losses before July 1, 1973, due in large part to the 34th Street lease and payroll commitments beyond its means.

Sometime about May 1973, J.J. Warsaw discussed with Shawn the possible sale of Studios. He made a serious offer of $400,000 to Shawn. Shawn rejected the offer.

Shawn thought that Studios could be made profitable if it could get out of the 34th Street lease which Shawn considered "debilitating" and if the number of employees could be reduced. Shawn obtained legal advice on how to do this.

Acting on legal advice, the 10 shareholders decided to organize a new corporation. On June 29, 1973, a corporation was incorporated under New York law under the name of Pegasus Studio, Ltd. (See note 4 *supra*.) Three days later, on

July 2, 1973, the directors and shareholders of this corporation met and unanimously approved a resolution to amend the certificate of incorporation to change the corporation's name to Warsaw Photographic Associates, Inc. (This corporation is the petitioner in the instant case.) Also, at this meeting, a plan for the issuance of common stock pursuant to section 1244 was adopted, effective June 29, 1973, and a form of subscription agreement was approved. Each of the 10 shareholders[9] subscribed to and paid for 100 shares of common stock (par value of $0.05) for $100 per share, or a total price of $10,000 for 100 shares. The total number of shares issued on petitioner's incorporation was 1,000 shares (hereinafter sometimes referred to as the 1,000 shares), for a total capital of $100,000.[10]

At this meeting, the officers of petitioner were elected as reflected in table 3.

TABLE 3

| Name | Office |
|---|---|
| Shawn[11] | President |
| Riley[11] | Executive Vice President |
| Dennis[11] | Vice President |
| Basilion[11] | Vice President |
| Martin[11] | Vice President |
| Chester Sliwak | Secretary and Treasurer |
| Robert A. Jacobs[11] | Assistant Secretary |
| Raymond A. Mantle | Assistant Secretary |

At this meeting, petitioner adopted a plan whereby Studios was to transfer all of its operating assets[12] to petitioner. In connection with this plan, the 10 shareholders, who were also shareholders of Studios, were to each receive directly 10

---

[9]Dennis subscribed together with Anna Dennis, with right of survivorship.

[10]The directors and shareholders also authorized petitioner's treasurer to "credit the stated capital account of [petitioner] with $0.05 per share, aggregating $50 and to credit the capital surplus account of [petitioner] with $99.95 per share, aggregating $99,950." On its corporate income tax returns filed for taxable years 1974, 1975, and 1976, however, petitioner listed $100,000 as stated capital and did not list any capital surplus.

[11]These officers were also directors.

[12]Petitioner understood the operating assets of Studios to consist of: "(1) the right to use [Studios'] corporate name [i.e., Warsaw Studios, Inc.] or a similar name for purposes of conducting business in the state of New York; (2) [Studios'] goodwill, customer lists and all incidents relating to the conduct of its business; (3) all of [Studios'] rights under a certain lease of office space at 36 East 31 Street, New York City [i.e., the 31st Street leases]; (4) all of [Studios'] photographic and industrial supplies; and (5) all of [Studios'] furnishings and equipment, including cameras, developing equipment and office furnishings (excluding, however [Studios'] telephone system installed at 40 East 34 Street, New York City [i.e., the 34th Street lease], and [Studios'] computer which is no longer used in [Studios'] business."

additional shares of petitioner's common stock.[13]

On June 27, 1973, Studios' board of directors held a special meeting at which they adopted a plan of reorganization. Studios' directors understood the reorganization to involve a transfer of substantially all its assets to petitioner and the issuance by petitioner of 100 shares of its stock (hereinafter sometimes referred to as the 100 shares) directly to the 10 shareholders. Studios' understanding of "substantially all of its assets" is the same as petitioner's understanding of all of Studios' operating assets (see note 12 *supra*). As part of this plan, the 10 shareholders were to surrender their stock in Studios for cancellation.

On July 2, 1973, Studios and petitioner entered into a written agreement of "REORGANIZATION, SALE and PURCHASE" which provides in relevant part as follows:

WITNESSETH:

WHEREAS, the Buyer [petitioner] wishes to acquire (1) the right to use the Seller's [Studios'] name or similar name for certain purposes; (2) the Seller's goodwill; (3) the rights under a lease of office space at 36 East 31st Street, New York; (4) certain film and industrial supplies (the "Film and Supplies"); and (5) all of the furnishings and equipment of the Seller, including, without limitation, cameras, developing equipment and office furnishings, but excluding the Seller's telephone system and computer (such furnishings and equipment hereinafter referred to as the "Furnishings and Equipment") (the "Film and Supplies" and the "Furnishings and Equipment" hereinafter collectively referred to as the "Assets"), in exchange for the issuance of certain shares of the Buyer's stock to certain of the Seller's shareholders, the payment of certain sums of money and the assumption of certain obligations of Seller;

    \*    \*    \*    \*    \*    \*    \*

3. *Sale and Transfer of Property.*

(a) *Sale and Transfer.* (A) Subject to the terms and conditions of this Agreement, the Seller is hereby selling, conveying, ceding, transferring and delivering to the Buyer, and the Buyer is hereby accepting, (a) all of the Seller's right, title and interest in and to the Film and Supplies, (b) all of the Seller's right, title and interest in and to the Furnishings and Equipment, (c) the right to the use of the name "Warsaw Studios, Inc." or a similar name in the State of New York for the purpose of conducting a photography business,

---

[13]The record does not include any evidence that these additional shares were issued, and that they were issued directly to the 10 shareholders. However, both sides apparently assume on brief that these additional shares were so issued, and we so find.

(d) the goodwill of the Seller, and (e) all of the right, title and interest of the Seller in and to the 31st Street Lease.

(b) *Consideration for Sale and Transfer.* Subject to the terms and conditions of this Agreement, in full consideration for the aforesaid sale, conveyance, cession, transfer and delivery,

(1) The Buyer is hereby issuing 10 shares of Common Stock, $.05 par value, of the Buyer to each of the shareholders of the Seller other than Warsaw & Co., Inc. who are the only shareholders of the Buyer.

(2) No later than ten days from the date hereof, the Buyer will deliver to the Seller a check in New York Clearing House Funds in the amount of $1,000, representing payment in full for the Film and Supplies;

(3) No later than ten days from the date hereof, the Buyer will deliver to the Seller a check in New York Clearing House Funds in the amount of $5,000, representing partial payment for the Furnishings and Equipment and the other rights conveyed hereby;

(4) No later than 120 days from the date hereof, the Buyer will deliver to the Seller a check in New York Clearing House Funds in the amount of $5,000, representing partial payment for the Furnishings and Equipment and the other rights conveyed hereby;

(5) No later than 165 days from the date hereof, the Buyer will deliver to the Seller a check in New York Clearing House Funds in the amount of $5,000, representing partial payment for the Furnishings and Equipment and the other rights conveyed hereby;

(6) No later than 210 days from the date hereof, the Buyer will deliver to the Seller a check in New York Clearing House Funds in the amount of $5,000, representing payment in full for the Furnishings and Equipment and the other rights conveyed hereby;

(7) The Buyer is hereby assuming and agreeing to perform (a) all of the Seller's obligations under the 31st Street Lease; and (b) all of the Seller's liabilities and obligations to customers arising out of the ordinary course of business of the Seller through the date hereof, including, without limitation, (a) liabilities to customers in connection with the completion of work in process, (b) liabilities and obligations arising with respect to warranties of products to customers, and (c) the Seller's obligation to return to its customers all property of such customers currently held by the Seller.

In addition to this written agreement, Studios and petitioner executed five more documents on July 2, 1973. In the first, entitled "CONVEYANCE AND ASSIGNMENT", Studios agreed "for and in consideration of $1.00 and other good and valuable consideration" to transfer the agreed-upon assets to petitioner. In the second, entitled "UNDERTAKING", petitioner agreed to "assume and * * * pay, perform and discharge" all of Studios' obligations under the 31st Street leases and all of Studios' liabilities and obligations arising out of the ordinary course of business. The third is an assignment of Studios' "right, title and interest" in the 31st Street leases to petitioner. The fourth

is a security agreement. The fifth is a Uniform Commercial Code Financing Statement with regard to all equipment and furnishings at 40 East 34th Street and 36 East 31st Street, excluding films and industrial supplies.

Studios transferred to petitioner the assets to fully equip 10 photography studios, as well as assets used in Studios' bookkeeping office, fitting rooms, carpentry shop, storage center, and shipping room. The furnishings and equipment transferred from Studios to petitioner have a useful life of 10 years and include the following:

1. *Photography studios*: Cameras (including a Deardorff camera), enlargers (including a Saltzman enlarger), camera filters, stands, desks, lights (including strobe, keg, and Ascor lights), a hot press, cutting equipment, cabinets, partitions, shelving, Paz 1 converter, darkroom equipment (e.g., trays and tanks), film holders, color laboratory equipment (including a spectrograph), movable wooden folders, and light boxes.

2. *Bookkeeping office*: Desks and adding machines.

3. *Fitting room*: Stands, mirrors, and sewing machines.

4. *Carpentry shop*: Drill press, band saws, and table top saws.

5. *Storage center and shipping room*: Conveyor, shelving, wrapping paper, stands, scales, and tape machines.

6. *Miscellaneous fixed assets*: Photostat machine, furniture (including stools and chairs), refrigerators, and an electric range.

The value of the assets to be transferred by Studios was discussed among and negotiated by the executive employees of Studios, some of whom were also shareholders of petitioner. Shawn, then president of both Studios and petitioner, wrote a letter, dated July 2, 1973, to Studios' counsel confirming that in his opinion $20,000 for all of Studios' equipment was fair to both parties. In this letter, Shawn stated that "we have assured you that the value ascribed to the equipment is fair—not less than that which would have been realized had the equipment been sold to another purchaser under any conditions known to us at this time." The results of the discussion about value of the assets were brought to the attention of J.J. Warsaw at his home to ascertain his views as to whether the figures agreed on were fair and correct.

Studios could not get more than $20,000 for the equipment if it were sold at a forced sale to any third party and probably would get much less. A forced sale would be handled in a manner similar to an auction. Interested buyers would walk up to "auctioneers"—i.e., representatives of the seller—and make an offer. However, there would not be bidding. Buyers

would not receive receipts. Usually, the assets would be sold at low prices because the auctioneers would want to clean out the premises of the seller as quickly as possible. The transaction between petitioner and Studios was not a forced sale.

Studios contracted with petitioner to also transfer its goodwill. In the negotiations leading to the transaction between petitioner and Studios, the focus was not on the goodwill or going-concern value of Studios' business. Studios' creditors could not have forced Studios' employees to continue to work for Studios. Seventy-five of Studios' 126 employees were hired by petitioner when Studios transferred the assets to petitioner.

Studios assigned all its right, title, and interest in the 31st Street leases but did not assign its right, title, and interest in the 34th Street lease.

Petitioner agreed to complete Studios' work in progress and assume Studios' liabilities to customers in connection with this work as well as with regard to warranties of products and customers. As of July 2, 1973, Studios' work in progress had cost about $70,000. Petitioner spent about $70,000 to complete this work in progress and received about $150,000 therefor from its customers. As of July 2, 1973, this work in progress was of no value to Studios in its then-uncompleted state. Studios kept its computer and telephones, as well as cash and accounts receivable, to be used to pay its creditors.

On or about July 17, 1973, the lessor under the 34th Street lease sued on account of Studios' nonpayment of the July 1973 rent under this lease.

On July 23, 1973, Studios made a general assignment for the benefit of creditors. The assignee, Stanley S. Horvath (hereinafter sometimes referred to as Horvath), did not try to set aside Studios' transfer of assets to petitioner, because Horvath believed that petitioner had paid fair consideration for these assets. Horvath has not made any payment to Studios' creditors or to Warsaw & Co., Inc., the owner of all the outstanding preferred stock and 7,549 shares of the outstanding common stock. (See table 1 *supra*.)

On or about March 20, 1975, Studios filed its Federal corporate income tax return for its taxable year ending June 30, 1973. On this tax return, Studios claimed a net operating loss of $262,727. On or about March 20, 1975, Studios filed its tax return for the short period July 1 through July 24, 1973.

On this tax return, Studios claimed a net operating loss of $101,221 which, when added to the previous year's loss, made a total of $363,948. On or about March 17, 1975, petitioner filed its tax return for its taxable year 1974, on which it deducted this $363,948.

The 100 shares did not constitute part of the consideration paid by petitioner to Studios in exchange for substantially all of Studios' assets.

## Legal Expenses

During its taxable year 1974, petitioner paid and incurred certain legal expenses, including $942 as an organizational expense and $3,400 in connection with the consummation of the transaction between Studios and petitioner under the written agreement of July 2, 1973. Both the $942 and the $3,400 were deducted in full on petitioner's 1974 taxable year tax return.

Petitioner did not file a statement with its tax returns for taxable years 1974, 1975, and 1976, setting forth: (1) The description and amount of either its organizational expenses or the expenses paid or incurred in connection with the transaction with Studios; (2) the month in which petitioner began business; and (3) the number of months over which such expenses were to be deducted ratably.

## Covenant Not To Compete

Petitioner entered into an agreement of purchase and sale dated December 20, 1973, with Color Masters, Inc. (hereinafter sometimes referred to as Color Masters), a New York corporation, and Michael Pelio (hereinafter sometimes referred to as Pelio), the principal executive of Color Masters.

Under this agreement, Pelio covenanted not to compete with petitioner in the business of color film processing "in any part of the City of New York or the Metropolitan New York Area" for a period of 6 years, beginning on the closing date of the agreement. Pelio and petitioner further agreed to the following remedies for Pelio's violation of the covenant:

8.2 *Remedies for Violation.* If any of the restrictions on competitive activities contained in section 8.1 shall for any reason be held excessively broad it shall be construed by limiting and reducing it, so as to be

enforceable to the extent compatible with the applicable law as it shall then appear, it being understood that at the time of execution of this agreement the parties hereto regard said restrictions as reasonable and compatible with their respective rights. [Petitioner] and Pelio agree that a violation of the foregoing covenant not to compete, or of any provisions thereof, will cause irreparable injury to [petitioner] and its subsidiaries, if any, and that [petitioner] shall be entitled, in addition to any other rights and remedies it may have, at law or in equity, to an injunction enjoining and restraining Pelio from doing or continuing to do any such act and any other violations or threatened violations of this section 8.

As consideration for Pelio's covenant, petitioner agreed to pay Pelio $31,000, payable in 31 monthly installments of $1,000, each. Petitioner paid Pelio $3,000, $12,000, and $12,000 during its taxable years 1974, 1975, and 1976, respectively, and deducted these amounts on its tax returns for those years. Respondent partially disallowed these deductions. In the notice of deficiency in the instant case, respondent allowed deductions for these payments in the amounts of $2,583, $5,166, and $5,166, for the taxable years 1974, 1975, and 1976, respectively.

The life of the covenant not to compete is 6 years.

OPINION

## I. D Reorganization

Ordinarily, a corporation is a separate entity for Federal income tax purposes; its tax attributes are not combined with those of its shareholders or other corporations. One of the major exceptions to this normal rule is part of the complex of provisions relating to corporate reorganizations,[14] in particular that part of the complex that allows a corporation to use for income tax purposes certain parts of the income tax history of another corporation.

Corporate reorganizations, as defined in one or another of the subparagraphs of section 368(a)(1), qualify for special treatment for Federal income tax purposes under certain rules. The dispute in the instant case is as to whether petitioner is entitled to the special treatment provided under

---

[14]Other major exceptions are subch. S (sec. 1361 et seq.) and ch. 6 (sec. 1501 et seq.). See generally B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 1.05, at 1–14 et seq. (4th ed. 1979), hereinafter sometimes referred to as Bittker & Eustice.

two of these rules. One of these rules gives a transferee corporation a carryover basis (subject to certain adjustments) in the assets acquired from the transferor corporation. Sec. 362(b).[15] The other of these rules allows the transferee corporation to "succeed to and take into account" certain tax attributes of the transferor, including net operating loss carryovers (the tax attribute in issue in the instant case). Secs. 381(a), 381(c).[16]

Of the various definitions of corporate reorganization, the parties have apparently limited the controversy to whether the transaction qualifies as nondivisive D reorganization (sec. 368(a)(1)(D));[17] we have chosen in the instant case to adhere to

---

[15]SEC. 362. BASIS TO CORPORATIONS.

(b) TRANSFERS TO CORPORATIONS.—If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the exchange of stock or securities of the transferee (or of a corporation which is in control of the transferee) as the consideration in whole or in part for the transfer.

[16]Secs. 381(a) and 381(c) provide, in relevant part, as follows:

SEC. 381. CARRYOVERS IN CERTAIN CORPORATE ACQUISITIONS.

(a) GENERAL RULE.—In the case of the acquisition of assets of a corporation by another corporation—

$$* \qquad * \qquad * \qquad * \qquad * \qquad * \qquad *$$

(2) in a transfer to which section 361 (relating to nonrecognition of gain or loss to corporations) applies, but only if the transfer is in connection with a reorganization described in subparagraph (A), (C), (D) (but only if the requirements of subparagraphs (A) and (B) of section 354(b)(1) are met), or (F) of section 368(a)(1),

the acquiring corporation shall succeed to and take into account, as of the close of the day of distribution or transfer, the items described in subsection (c) of the distributor or transferor corporation, subject to the conditions and limitations specified in subsections (b) and (c).

$$* \qquad * \qquad * \qquad * \qquad * \qquad * \qquad *$$

(c) ITEMS OF THE DISTRIBUTOR OR TRANSFEROR CORPORATION.—The items referred to in subsection (a) are:

(1) NET OPERATING LOSS CARRYOVERS.—The net operating loss carryovers determined under section 172, subject to * * * conditions and limitations * * *

[The subsequent amendment of sec. 381(a) (by sec. 4(g) of the Bankruptcy Tax Act of 1980, Pub. L. 96–589, 94 Stat. 3389, 3404 (1980)) does not affect the instant case.]

[17]SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(a) REORGANIZATION—

(1) IN GENERAL.—For purposes of parts I and II and this part, the term "reorganization" means—

$$* \qquad * \qquad * \qquad * \qquad * \qquad * \qquad *$$

(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of

the parties' view of the parameters of the controversy. See *Estate of Fusz v. Commissioner*, 46 T.C. 214, 215 n. 2 (1966).

In order to qualify as a nondivisive D reorganization[18] (and thus, permit petitioner to (1) use Studios' bases for calculating depreciation, and (2) under sections 368(a)(1)(D) and 354,[19] deduct Studios' net operating losses), the transaction in the instant case must satisfy a series of statutory requirements and also a series of judicial requirements.[20]

Respondent contends that the transfer from Studios to petitioner does not qualify as a nondivisive D reorganization because it does not satisfy certain of the statutory and judicial requirements. Instead, respondent contends, the transfer of assets from Studios to petitioner is a sale. Respondent maintains that the transaction does not satisfy the statutory requirement that stock of the transferee corporation (i.e., petitioner) be issued and distributed in the purported reorganization. Respondent also maintains that the transaction does not satisfy the judicial requirement of continuity of interest.

---

the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356 * * *

[18]D reorganizations are commonly described as falling in either of two categories. One is called a divisive D reorganization—i.e., spinoff, splitoff, or splitup. The other category—the one which is at the center of the instant case—is called a nondivisive D reorganization. See Phillips, "Corporate Acquisitions—D Reorganizations," 417 Tax Mgmt. at A—1 (BNA 1981). A nondivisive D reorganization involves one corporation (the transferee) acquiring substantially all the assets of another corporation (the transferor), and then, after the transfer, the transferor being liquidated. Secs. 368(a)(1)(D) and 354.

[19]Sec. 354 provides, in relevant part, as follows:

SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.
    (a) GENERAL RULE.—
        (1) IN GENERAL.—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

                *       *       *       *       *       *       *

    (b) EXCEPTION.—
        (1) IN GENERAL.—Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless—
            (A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and
            (B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.

[The subsequent amendment of sec. 354(b)(1) (by sec. 4(h) of the Bankruptcy Tax Act of 1980, Pub. L. 96–589, 94 Stat. 3389, 3404 (1980)) does not affect the instant case.]

[20]"It remains true, therefore, that literal compliance with the reorganization provisions is not enough; a transaction will be governed by the statutory provisions only if it comes within their presuppositions as well as their language." Bittker & Eustice, *supra*, par. 14.03, at 14—11. See *Atlas Tool Co. v. Commissioner*, 70 T.C. 86, 100 (1978), affd. 614 F.2d 860 (3d Cir. 1980).

Specifically, respondent asserts that the continuity of interest requirement is not satisfied because either (1) "the preferred shareholder [Warsaw & Co., Inc.] had the proprietary interest in [Studios]" and did not continue an interest in petitioner, or (2) the minority shareholders who did continue an interest "had too small a proprietary interest in [Studios]."

Petitioner contends that the transaction between Studios and petitioner qualifies as a nondivisive D reorganization because it satisfies all the statutory and judicial requirements. In particular, petitioner contends that the 100 shares were given as consideration for Studios' assets and that the 100 shares were worth at least $42,727, far more than the $21,000 of cash and other property transferred by petitioner to Studios. Petitioner further contends that the fact that the 100 shares were issued directly to the 10 shareholders, rather than first to Studios and then distributed from Studios to the 10 shareholders, does not mean that petitioner's stock was not distributed within the meaning of section 354(b)(1)(B). Petitioner also asserts that the continuity of interest requirement is satisfied. In making this assertion, petitioner further contends that the proper test for applying the continuity of interest test is whether the stock of the transferee corporation (petitioner) represents a substantial part of the consideration given in the transaction and not whether a certain percentage of historic shareholders of the transferor continue as shareholders of the transferee.

We agree with respondent that the transaction is not a D reorganization because of the failure to satisfy the statutory requirement that petitioner's stock be transferred to Studios and distributed in a transaction which qualifies under sec. 354.

In order for a transaction to be a D reorganization, the transaction must be one "which qualifies under section 354." (Sec. 368(a)(1)(D); *Baan v. Commissioner*, 51 T.C. 1032, 1040 (1969), affd. sub nom. *Gordon v. Commissioner*, 424 F.2d 378 (2d Cir. 1970), affd. 450 F.2d 198 (9th Cir. 1971).) In order for petitioner to succeed to Studios' net operating losses under a D reorganization, Studios must have received stock of petitioner, and Studios must have distributed the stock it thus received (secs. 354(a)(1) and 354(b)(1)(B)). The July 2, 1973, agreement between petitioner and Studios provides (at 3(b)(1)) that, as part of the consideration flowing from petitioner to Studios,

"The Buyer is hereby issuing 10 shares of Common Stock, $.05 par value, of the Buyer to each of the shareholders of the Seller other than Warsaw & Co., Inc. who are the only shareholders of the Buyer." There was not literally a transfer of petitioner's stock from petitioner to Studios and a distribution of this stock by Studios to Studios' shareholders. Accordingly, we conclude that the statute's formal requirements have not been met in this regard.

It is true that "we have repeatedly held that, when the stock ownership of transferor and transferee is identical, the actual distribution would be a mere formality and the statute [sec. 368(a)(1)(D)] may be satisfied without it. See *American Manufacturing Co. v. Commissioner*, 55 T.C. 204, 221 (1970); *James Armour, Inc. v. Commissioner*, 43 T.C. 295, 307 (1964)." *Atlas Tool Co. v. Commissioner*, 70 T.C. 86, 97 (1978), affd. 614 F.2d 860, 865 (3d Cir. 1980). See also *Rose v. United States*, 640 F.2d 1030, 1034 (9th Cir. 1981). However, in the instant case, the stock ownerships of petitioner and Studios were not identical. Warsaw & Co., Inc., which owned about 80 percent of Studios' common stock and all of Studios' preferred stock, was not a shareholder in petitioner. The 10 shareholders, each holding 10 percent of petitioner's shares, had differing holdings in Studios. These holdings ranged from Zad's 375 shares down to Sinn's 92 shares. Indeed, apart from Shawn and Neil (each holding 250 shares), none of the 10 shareholders held the same number of Studios' shares as any of the others among the 10 shareholders (see table 1 and subsequent text, *supra*), even though all were equal shareholders in petitioner.

Thus, the instant case does not qualify for the one exception that the courts have created regarding the stock transfer and distribution rule. Compliance with this rule is essential for the net operating loss carryover benefit sought by petitioner (secs. 381(a)(2) and 354(b)(1)(B)) and the carryover basis benefit sought by petitioner (secs. 362(b), 368(a)(1)(D), 354(b)(1)(B)). Accordingly, we conclude that petitioner is entitled to use neither of the tax benefits it seeks to carry over from Studios.

On brief, petitioner makes the following contention regarding the stock transfer and distribution requirement:

Code section 354(b)(1)(B) requires that all properties of the transferor corporation must be distributed in pursuance of the plan of reorganization. This provision is satisfied whenever, pursuant to the plan of reorganization,

the shareholders of the transferor receive shares of the transferee sufficient to satisfy the control requirements of Code section 368(a)(1)(D). A direct issuance of shares of the transferee corporation to shareholders of the transferor corporation will suffice. An actual exchange of the transferor corporation's assets for shares of the transferee corporation, followed by a distribution of those shares to the transferor corporation's shareholders is not required. *See Commissioner v. Morgan*, 288 F.2d 676 (3d Cir. [1961]), *cert. denied*, 368 U.S. 836 (1961). *Accord, South Texas Rice Warehouse Co.*, 43 T.C. 540 (1965), *aff'd sub nom, Davant v. Commissioner*, 366 F.2d 874 (5th Cir. 1966), * * *. *See also Retail Properties, Inc.*, 23 T.C.M. 1463 (1964) and Rev. Rul. 79-257, 1979-2 C.B. 136 * * *. Where as in the case at bar the acquiring corporation issues stock directly to the shareholders of the transferor corporation in consideration of the assets received from the transferor corporation, the transfer is treated as if the shares were first issued to the transferor corporation and then distributed in redemption of the outstanding shares of the transferor corporation.

We believe petitioner's reliance on the cases it cites is misplaced.

In *Commissioner v. Morgan*, 288 F.2d 676 (3d Cir. 1961), the Court of Appeals for the Third Circuit reversed this Court (*Morgan v. Commissioner*, 33 T.C. 30 (1959)), holding that an actual transfer and distribution of the transferee corporation's stock "would have been a meaningless gesture" in that case, since one individual held all the stock in both the transferor corporation and the transferee corporation (288 F.2d at 680, see 33 T.C. at 32). In *South Texas Rice Warehouse Co. v. Commissioner*, 43 T.C. 540 (1965), we rejected the taxpayers' contention that a transaction did not qualify as a D reorganization because no stock was transferred and distributed. In that case, each of the 14 individuals who were the shareholders held the same percentage of the transferor corporation's stock as he or she held in the transferee corporation. (43 T.C. at 544.) The Court of Appeals for the Fifth Circuit noted the identity of ownership, followed the rationale of *Morgan*, and affirmed on this point. (*Davant v. Commissioner*, 366 F.2d 874, 886-887.) In *Retail Properties, Inc. v. Commissioner*, T.C. Memo. 1964-245, the transferee corporation was a wholly owned subsidiary of the transferor corporation. When the transferor liquidated, it distributed to its shareholders, pro rata (except for cash in lieu of fractional shares), the stock of its subsidiary, the transferee. In Rev. Rul 79-257, 1979-2 C.B. 136, respondent ruled that a distribution by a wholly owned subsidiary to its parent corporation may qualify as a partial liquidation under section

346(a)(2) (as in effect before the Tax Equity and Fiscal Responsibility Act of 1982), even though there is no redemption of stock.[21]

All of these authorities[22] on which petitioner relies are distinguishable from the instant case in that the transferors and transferees in those instances had identical ownership, while in the instant case, the ownership interests in petitioner and Studios differed widely. Further, in each of these cases in which a court has held that the requirement of an actual stock transfer and distribution may be ignored, it was respondent who urged on the court that the realities of the situation belied the form chosen by the taxpayer. In those situations where the courts have departed from the literal language of the statute, it was to counter a perceived abuse by the taxpayer, these courts having concluded that the taxpayer should not be permitted to shape the form of the transaction so as to secure an unwarranted benefit. See B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 14.54, at 14-159—14-160. We have not found, and petitioner has not cited us to, any case in this area in which the court has acceded to a taxpayer's urging that the taxpayer be permitted to obtain a D reorganization tax benefit even though the form of the transaction which the taxpayer shaped did not meet the literal requirements of the statute.

Petitioner contends that the "transaction in form and in substance qualified as a reorganization described in Code section 368(a)(1)(D)". Petitioner states that the transaction and Studios' subsequent assignment for benefit of creditors were designed as a convenient way to shed a burdensome obligation (i.e., the 34th Street lease). Petitioner concludes as follows:

Had [Studios] followed a formal redemption/Chapter XI format, the reorganized corporation unquestionably could have carried over and utilized its pre-Chapter XI reorganization net operating losses. A different result should not obtain where the parties, on the advice of their respective counsel, achieved the same substantive results utilizing a (D) reorganization format.

------

[21]In Rev. Rul. 81-3, 1981-1 C.B. 125, respondent ruled that a pro rata distribution by a corporation to its shareholders may also qualify as a partial liquidation even if there is no actual surrender of stock.

[22]As to the precedential value of Memorandum Opinions and Revenue Rulings, see, e.g., *Newman v. Commissioner*, 68 T.C. 494, 502 n. 4 (1977), and *Estate of Smead v. Commissioner*, 78 T.C. 43, 47 n. 5 (1982), respectively.

We have already concluded that the transaction failed to satisfy one of the formal statutory requirements of section 368(a)(1)(D). As to the substance, we note that the parties to the transaction chose to create a new corporation rather than continue the old one; we are not persuaded that they should have the tax benefits they seek merely because they could have achieved the same business purposes by a different route that would have continued the old corporation and thereby provided these benefits.[23]

When we examine the substance of what was done, we conclude that it points toward "sale" at least as much as toward "reorganization". Ten people put up an aggregate of $100,000 to acquire and bankroll a going business. The business had suffered substantial losses. The 10 shareholders trimmed the work force and avoided the burdens of an unfavorable lease, and apparently succeeded in reviving the business. The 10 shareholders had owned about 20 percent of the old corporation's common stock and none of its preferred. If they had purchased the remaining common stock or a controlling interest, then (as petitioner notes on brief) the corporation's tax characteristics would not be affected by the substance of the change in ownership and control. Apparently, for a legitimate business reason (escaping from the burdens of the 34th Street lease), the 10 shareholders specifically turned down an opportunity to buy the old corporation, thus turning down the simple route toward retention of the old corporation's tax attributes.

If the 10 shareholders (or petitioner, their new corporation) had merely purchased Studios' assets, then the transaction would be a sale, the normal tax rules would apply (i.e., petitioner would not be entitled to use Studios' tax attributes) even though petitioner carried on the business that Studios had carried on and did so with essentially the same work force at the "same old stand."

What, in these circumstances, is the matter of substance that distinguishes the transaction from a sale? Petitioner

---

[23]"Petitioners are liable for the tax consequences of the transaction that they actually executed; they may not reap the benefits of some other transaction that they might have effected instead. *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 579 * * * (1977); *Commissioner v. Nat'l. Alfalfa Dehydrating*, 417 U.S. 134, 149 * * * (1974)." *Brown v. Commissioner*, 706 F.2d 755, 756 (6th Cir. 1983), affg. T.C. Memo. 1981–608.

contends that the issuance of the 100 shares is an element of substance that (1) enables the transaction to satisfy the statutory requirement of stock distribution, (2) enables the transaction to satisfy the judicial requirement that its stock be a substantial part of the consideration given by it, and (3) as an alternative, enables petitioner to substantially increase its basis in the assets received from Studios. In connection with the latter two points, petitioner contends that the 100 shares were worth $349,000.[24]

After examining the transaction with care in light of petitioner's contentions, we note the following:

Firstly, the 100 shares effected no change, not even a subtle one, in the positions of the 10 shareholders. Each of the 10 shareholders merely had one extra piece of paper. See *Eisner v. Macomber*, 252 U.S. 189 (1920). None involved in the transaction—not petitioner, Studios, the 10 shareholders, Warsaw & Co., Inc., or J.J. Warsaw—were any richer or any poorer on account of the issuance of the 100 shares, than they would have been if no shares were issued or if 1 million shares were issued.

Secondly, care was taken to be sure that the 100 shares were not held by Studios at any time. This element is of some significance because Studios made a general assignment for the benefit of creditors only 3 weeks after the transaction in dispute, and the assignee was not able to find assets to make any payments to the creditors.

Thirdly, although the 100 shares were supposed to be issued to the 10 shareholders in their capacities as Studios' shareholders, they were issued (see note 13 *supra*) in proportion to the 10 shareholders' ownership of petitioner and not in proportion to the 10 shareholders' ownership of Studios.

Fourthly, petitioner contends that the 100 shares were worth a total of $349,000, while at the same time the initial 1,000 shares were worth a total of $100,000. The contentions, as to identical shares issued virtually simultaneously, are

---

[24]On opening brief (pp. 23–24), petitioner states that after "the transfer the value of the shareholders' equity in [petitioner] increased from $100,000 to $449,000 ($100,000 + $370,000 – $21,000). Thus the shares 'issued' in the transaction represented 77.7% (349/449) of [petitioner's] value." The $349,000 value is also contended for on page 40 of petitioner's opening brief, and implicitly on page 58 of petitioner's opening brief.

However, on other pages of petitioner's opening brief, petitioner contends for values of "not less than $42,727" (p. 39) and $80,000 (p. 40).

manifestly inconsistent. We are not given any hint as to why the 100 shares would be worth $3,490, each, while the 1,000 shares were worth $100, each.

On answering brief, petitioner tells us that "Taxation is a practical art; labels will not replace or substitute for judgment as to the roles played by the parties and whether or not those roles were acted out in such a way as to effect a reorganization described by the Internal Revenue Code". We agree. We conclude that, as a practical matter, the appearance of the 100 shares in the transaction provides only a smell of reorganization. We will not speculate as to why the July 2, 1973, agreement provided for the issuance of the 100 shares in such a manner that their issuance satisfies neither the form nor the substance of section 368(a)(1)(D). We conclude that the 100 shares did not constitute any part of petitioner's consideration for the assets, tangible or intangible, that petitioner received from Studios. Finally, petitioner contends as follows:

Respondent implies that each of the exhibits is to be viewed as evidence, not only as to the existence of the document but also as to the truth of each statement made in the document. If respondent is correct, then those documents establish petitioner's contention that 100 shares of [petitioner's] stock was paid by [petitioner] to [Studios] in partial consideration for the transfer of the [Studios] assets to [petitioner] [Exhibit 6-F].

Petitioner overlooks the fact that neither party requested that the exhibits to which petitioner's contention relates be received only for limited purposes (see rule 105, Fed. R. Evid.), and the Court did not limit the purposes for which this evidence was received. Accordingly, the exhibits may be used as evidence of the truth of the matters stated therein. It does not follow from this that the mere fact that a statement appears in an exhibit is necessarily enough to *establish* the truth of the statement. We may accept Homer's "Iliad" as evidence that there was a Troy and that the Trojan War took place, without thereby being required to agree to the truth of Homer's statements about the roles of Eris and the other members of the Greek pantheon in the creation and prosecution of the war.

For reasons we have set forth *supra*, we do not believe that the statement that petitioner refers to in Exhibit 6-F establishes that there has been compliance (either in form or in

substance) with the stock transfer and distribution requirements for a D reorganization.

To sum up: petitioner is not entitled to use Studios' bases for depreciation of assets and is not entitled to deduct Studios' net operating losses unless petitioner shows that it has complied with the requirements of a D reorganization. *Baan v. Commissioner, supra.* See also *Corn Products Co. v. Commissioner,* 350 U.S. 46, 52 (1955), where, in another context, the Supreme Court stated that "an exception from the normal tax requirements of the Internal Revenue Code, * * * must be narrowly applied and its exclusions interpreted broadly." Petitioner acknowledges that the transaction failed to comply with one of the requirements of the statute, but seeks to excuse this failure by citing certain authorities. Those authorities rest on circumstances (identical ownership of the corporations that are parties to the reorganization) which are materially different from the facts of the instant case. *Atlas Tool Co. v. Commissioner, supra; Baan v. Commissioner,* 51 T.C. at 1038–1039. There was no substance to the issuance of the 100 shares. Petitioner cannot escape from the failure of the transaction to comply with the statute. Petitioner is not entitled to the tax benefits of another corporation's bases and net operating losses.

We hold for respondent on this issue.[25]

## II. The 100 Shares

Petitioner contends that, if we hold for respondent on the reorganization issue, then petitioner's bases for depreciation of the assets acquired from Studios should be increased by the fair market value of the 100 shares issued by petitioner (see note 24 *supra*), to a total of $150,000; also the base for the investment credit should be correspondingly increased. (Petitioner notes the statute then in effect imposed a $50,000 statutory ceiling on investment in used section 38 property.) Petitioner relies on sections 167(g), 1011, 1012, and 1016(a), arguing that the 100 shares were issued in exchange for Studios' assets.

---

[25]Since we hold that petitioner failed to vault the statutory hurdle of stock transfer and distribution, it is not necessary to determine whether petitioner succeeded in vaulting the judicial hurdle of continuity of interest.

Respondent's primary position is that no additional basis is attributable to the 100 shares because they were not issued in exchange for the assets transferred from Studios but rather were either (1) in exchange for the 10 shareholders' original capital investment in petitioner or (2) a stock dividend. Alternatively, respondent asserts that the "100 shares were worth no more than and probably less than, $9,091 ($\frac{1}{11}$ of the $100,000 capital)."

We agree with respondent's primary position.

We have found that the 100 shares did not constitute part of the consideration paid by petitioner to Studios in exchange for substantially all of Studios' assets. We have elaborated on this matter in our discussion of the D reorganization issue, *supra*, and see no need to repeat our analysis at this point. We have not found any substance to the issuance of the 100 shares. (See note 13 *supra*.)

We hold for respondent on this issue.

### III. Legal Expenses

Of the $4,342 paid for legal expenses, the deductibility of which is in issue, the parties agree that $942 was paid for organizational expenses of petitioner. The parties disagree as to whether petitioner made a proper election to amortize this amount under section 248.[26]

---

[26]SEC. 248. ORGANIZATIONAL EXPENDITURES.

(a) ELECTION TO AMORTIZE.—The organizational expenditures of a corporation may, at the election of the corporation (made in accordance with regulations prescribed by the Secretary or his delegate), be treated as deferred expenses. In computing taxable income, such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the corporation (beginning with the month in which the corporation begins business).

(b) ORGANIZATIONAL EXPENDITURES DEFINED.—The term "organizational expenditures" means any expenditure which—

(1) is incident to the creation of the corporation;

(2) is chargeable to capital account; and

(3) is of a character which, if expended incident to the creation of a corporation having a limited life, would be amortizable over such life.

(c) TIME FOR AND SCOPE OF ELECTION.—The election provided by subsection (a) may be made for any taxable year beginning after December 31, 1953, but only if made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof). The period so elected shall be adhered to in computing the taxable income of the corporation for the taxable year for which the election is made and all subsequent taxable years. The election shall apply only with respect to expenditures paid or incurred on or after the date of enactment of this title.

[The subsequent amendments of this provision by secs. 1901(a)(36) and 1906(b)(13) [sic] (A) of the Tax Reform Act of 1976, Pub. L. 94–455, 90 Stat. 1520, 1770, 1834, do not affect the instant case.]

Respondent contends that, in order to amortize the expenses under section 248, petitioner must make a timely election, as provided for under section 248(c) and section 1.248–1(c), Income Tax Regs. Respondent asserts that petitioner did not make such a timely election and thus, none of these expenses are deductible. Petitioner concedes that it erred in deducting the full $942 in its fiscal year 1974; however, petitioner contends that it may amortize these expenses under section 248 because "by claiming its $942 of organizational expenses as a deductible expense in the year of its organization * * * [it] manifested its decision to be bound by [the section 248] election."

As to the remaining $3,400 of legal expenses, respondent contends that (1) if we hold for respondent that there was no reorganization, then the $3,400 is to be added to the bases of the assets petitioner acquired from Studios and deducted by way of depreciation;[27] (2) alternatively, if we hold for petitioner that the transactions with Studios amounted to a D reorganization, then the $3,400 is an organizational expense to which section 248 applies and no deduction is allowable because petitioner failed to make an election under section 248. Petitioner contends that these expenses are not organizational expenses and thus, their deductibility is not controlled by section 248. Rather, petitioner contends, the amount must be apportioned among the following categories of assets it acquired from Studios: depreciable assets ($1,378.38, deducted by way of depreciation over these assets' stipulated 10–year useful life), going-concern value, and goodwill ($1,378.38, not deductible currently and not deductible by way of depreciation or amortization), and work in progress ($643.24, deductible in full currently).

As to the $942, we agree with respondent. As to the $3,400, we agree with respondent's first contention.

---

[27]At trial, respondent contended that the $3,400 was incurred incident to Studios' formation, and that no deduction is allowable with respect to this amount because petitioner failed to elect amortization under sec. 248. As noted in the text, on brief respondent has modified this position, at least if we hold that there was no reorganization. On answering brief, respondent also concedes that, if the $3,400 is to be added to petitioner's bases in the depreciable assets, then the $3,400 also is to be taken into account in computing petitioner's investment credit on account of its purchase of these assets. Correspondingly, petitioner concedes that, if we hold for it on the reorganization question, then no investment credit would be allowable on account of its acquisition of assets from Studios.

*A.  $942*

Section 248(a) affords a newly created corporation an opportunity to elect to amortize certain expenses over a period of time (not less than 60 months) chosen by the corporation. As petitioner acknowledges, but for this election, such expenditures are not deductible until the corporation is terminated. E.g., *McCrory Corp. v. United States*, 651 F.2d 828, 832–833 (2d Cir. 1981); *Malta Temple Association v. Commissioner*, 16 B.T.A. 409 (1929).

Section 248(a) provides that the election must be "made in accordance with regulations prescribed by the Secretary or his delegate". Under this statutory authority, respondent prescribed the following in section 1.248–1(c), Income Tax Regs.:

(c) *Time and manner of making election.* The election provided by section 248(a) and paragraph (a) of this section shall be made in a statement attached to the taxpayer's return for the taxable year in which it begins business. \* \* \* The statement shall set forth the description and amount of the expenditures involved, the date such expenditures were incurred, the month in which the corporation began business, and the number of months (not less than 60 and beginning with the month in which the taxpayer began business) over which such expenditures are to be deducted ratably.

No statement of the sort required by the regulation was attached to petitioner's tax "return for the taxable year in which it [began] business." None of the required information was noted on the tax return in connection with petitioner's deduction of the $942. Petitioner did not attempt, on its tax return, to select an amortization period of not less than 60 months for deducting the $942; rather, petitioner deducted the entire amount on its first tax return. Petitioner's deduction was inconsistent with any election that it might validly have made under section 248.

We conclude that petitioner failed to make an election under section 248. From petitioner's deduction, we conclude that petitioner did not intend to make an election under section 248. Nothing in the record or legal setting of the instant case makes it appropriate to consider the question of "substantial compliance" with the regulation. Cf. *Tipps v. Commissioner*, 74 T.C. 458 (1980). Under these circumstances, no deduction is allowed on account of the $942 organizational expense item in the years in issue.

We hold for respondent on this issue.

## B. $3,400

The $3,400 was paid and incurred by petitioner in connection with the transactions whereby petitioner succeeded to essentially the business conducted by Studios and the assets used by Studios. Although we agree with petitioner that the $3,400 ought to be apportioned among the assets, tangible and intangible, that it received from Studios, the inadequacy of the record hampers us in making determinations of value, or even relative value.

Petitioner asserts that the work in progress was worth $70,000, and that we should take this value into account in allocating the $3,400. However, on brief petitioner also asserts (and we have found) that the work in progress "was of no value to [Studios] in its then uncompleted state. " Petitioner received Studios' work in progress; in exchange, petitioner agreed to complete the work and to assume Studios' liabilities to customers in connection with the work. We have no reason to believe that the work in progress had a fair market value in excess of zero.

Petitioner asserts that Studios' goodwill and going-concern value was worth $150,000. No persuasive evidence was presented as to this value. Respondent contends that the "only asset [petitioner] received that had any value was the equipment". Respondent's position as to the goodwill and going-concern value results in greater amounts of deductions for depreciation, and a greater amount of investment credit, than petitioner's position.

We conclude that petitioner has failed to show that it is entitled to greater amounts of depreciation deductions on account of the $3,400 than those resulting from respondent's determination. We conclude that petitioner has failed to show that it is entitled to a greater amount of investment credit than that resulting from respondent's concession. (See note 27 *supra*.)

We hold, for respondent, that the $3,400 is to be added to the bases of the 10-year-useful-life assets that petitioner acquired from Studios.

## IV. Covenant Not To Compete

Petitioner contends that amounts paid by it under a covenant not to compete should be deductible over the number of months the payments were made—i.e., 31 months—because (1) the covenant was enforceable only over that period of time, and (2) such deductions would be consistent with petitioner's cash method of accounting.

Respondent maintains that the amounts are deductible ratably over the life of the covenant, which respondent asserts is 6 years, the stated term of the covenant. Respondent urges the Court to give no weight to Shawn's testimony on the unenforceability under State law of the covenant after 31 months.

We agree with respondent.

The price of a covenant not to compete is amortizable ratably over the life of the covenant. *United Finance & Thrift Corp. of Tulsa v. Commissioner*, 31 T.C. 278, 285–286 (1958), affd. 282 F.2d 919 (4th Cir. 1960).

In the instant case, the covenant states a term of 6 years. In order to persuade us that we should disregard the stated term and instead accept the period over which the payments were made (31 months), petitioner must present us with at least strong proof that the covenant not to compete was not intended to be for 6 years and was intended to be only for 31 months. See, e.g., *Ullman v. Commissioner*, 264 F.2d 305, 308 (2d Cir. 1959), affg. 29 T.C. 129 (1957); *Ledoux v. Commissioner*, 77 T.C. 293, 308 (1981), affd. 695 F.2d 1320 (11th Cir. 1983); *Miami Purchasing Service Corp. v. Commissioner*, 76 T.C. 818, 830 (1981); *Major v. Commissioner*, 76 T.C. 239, 247 (1981).

Petitioner tries to persuade us by asserting that the covenant not to compete would not be enforceable for 6 years. Petitioner cites but one case in support of its proposition that the covenant was enforceable under New York law for only the 31-month payout period. In the one cited case, *Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 246 N.Y.S.2d 600 (1963), the Court of Appeals of New York refused to enforce a covenant by an employee that, for 2 years after the termination of his employment, he would not work for a competitor within a 300-mile radius of New York City. By a 4 to 3 vote, the Court of Appeals held that the covenant should be tested by

the restrictive rules applicable to employment contracts and not the more lenient rules applicable to sales contracts. The three dissenters would have applied the sales contract rules and, agreeing with the courts below, would have enforced the covenant.

More recently, in *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 320 N.Y.S.2d 1, 363 N.E.2d 573 (1971), the Court of Appeals of New York upheld an employment covenant not to compete with the employer in the employer's line of business in a five-county area for an unlimited term. In *Gelder Medical Group v. Webber,* 41 N.Y.2d 680, 394 N.Y.S.2d 867 (1977), the Court of Appeals of New York upheld a covenant by a former partner not to compete with his former partnership within a 30-mile radius of a village for a 5-year term.

We are not persuaded that the Courts of New York State would refuse to enforce the covenant in the instant case. We conclude that petitioner has not adduced strong proof, and thus has failed to persuade us that the 6-year term is not the intended life of the covenant not to compete. We further conclude that the life of the covenant is 6 years and that the price of the covenant, $31,000, is amortizable over this period.[28]

We hold for respondent on this issue.

In order to reflect the foregoing and the parties' settlement of other issues,

*Decision will be entered under Rule 155.*

---

[28]Petitioner's proposed findings of fact set the transaction, and presumably the start of the covenant's term, as April 1974. This is consistent with the three monthly payments made in petitioner's taxable year 1974 (ending June 30). Respondent allows a deduction in petitioner's taxable year 1974 for one-twelfth of the total covenant payments, implying a January 1974 start of the covenant's term. This is consistent with the Dec. 20, 1973, date of petitioner's agreement with Color Masters and the "1/2/74" date shown on petitioner's income tax return as the date of petitioner's acquisition of Color Masters' stock. The parties do not favor us with an explanation of this discrepancy. Since respondent's position apparently is more favorable to petitioner than is petitioner's position, on this point, we leave the parties as we find them and allow petitioner to deduct $2,583 for petitioner's fiscal year 1974, implying a Jan. 1, 1974, start of the covenant's term.