GERALD SCHWERN AND JOYCE J. SCHWERM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schwerm v. Commissioner
Docket No. 1214-81.
United States Tax Court
T.C. Memo 1986-16; 1986 Tax Ct. Memo LEXIS 595; 51 T.C.M. (CCH) 270; T.C.M. (RIA) 86016; January 13, 1986. *595 Petitioner-wife received a bachelor of arts degree in Education and Sociology. Subsequently, she was employed by the Milwaukee Area Technical College as a Discussion Leader in the College's adult education program. As a Discussion Leader, she was a part-time member of the College's faculty. She enrolled in the University of Wisconsin, Milwaukee, as a candidate for a master of science degree in Educational Psychology--Counseling and Guidance, while continuing her employment as a Discussion Leader at the College. After being awarded the master of science degree, she began to participate in an Internship Program which involved course work at the University and acting as an intern guidance counselor at a high school. After completing the Internship Program, she was certified by the Wisconsin Department of Public Instruction whereupon she secured employment in another high school as a guidance counselor. Held: (1) Under sec. 1.162-5(b)(3)(i), Income Tax Regs., "all teaching and related duties shall be considered to involve the same general type of work." Petitioner-wife's education did not qualify her for a new trade or business. Petitioner-wife's education expenses are deductible. *596 Sec. 162(a), I.R.C. 1954. (2) Payments to petitioner-wife under the Intership Program are excludible from income as scholarships or fellowship grants. Sec. 117(a), I.R.C. 1954. (3) Petitioner-wife was not a candidate for a degree at an educational institution while she participated in the Internship Program; her exclusions from income are not to exceed the limits provided by sec. 117(b)(2)(B), I.R.C. 1954. Lawrence A. Trebon, for the petitioners. Ellen T. Friberg, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioners for 1976 and 1977 in the amounts of $1,183.34 and $1,734.00, respectively. After concessions by both sides the issues for decision [1] are as follows: (1) Whether petitioners may deduct education expenses under section 162; [2]
(2) Whether petitioners may exclude amounts received, as *597 scholarships or fellowship grants under section 117; and (3) If issue (2) is answered in the affirmative, then whether petitioners' exclusions are limited by section 117(b)(2). FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, petitioners Gerald Schwerm and Joyce J. Schwerm (hereinafter sometimes referred to as "Joyce"), husband and wife, resided in Milwaukee, Wisconsin. Discussion Leader
In June 1955, Joyce was graduated from Milwaukee State Teachers College with a degree of bachelor of arts in Education and Sociology. From September 1974 through June 1976, Joyce was employed as a Discussion Leader in the Milwaukee Area Technical College (hereinafter sometimes referred to as "MATC"), Family Living Education Program (hereinafter sometimes referred to as "the Family Program"). The Family Program is an adult education program which relies on group interaction. It is an outreach program, operating through discussion groups which meet at various locations in the community, including transition centers, community centers, day care centers, social *598 agencies, halfway houses, park buildings, store fronts, hospitals, libraries, churches, prisons, schools, and homes. Trained discussion leaders are provided for groups of ten or more people. Discussion topics are chosen in response to the needs of a group and according to the needs of the community at a given time. The topics have included parent-child relationships, family relationships, communication problems, self-awareness, assertiveness training, parent effectiveness training, coping with stress, and coping with problems of retirement. A Discussion Leader serves as a facilitator for a number of discussion groups. A Discussion Leader begins a discussion group session by supplying participants with background information concerning the discussion topic, through the use of resource materials, which may include textbooks, films, filmstrips, slides, overhead projectors, records, newsprints, and handout materials. In planning for a discussion group, Joyce and other Discussion Leaders either would meet with the Family Program's coordinator to establish the format, or would establish the format independently and then indicate to the coordinator the information and materials which *599 are to be used. If necessary, the Family Program provides the required materials to the Discussion Leader. Joyce selected the materials for use in her discussion groups. After supplying the background information to the participants, the Discussion Leader uses techniques to help participants feel comfortable with the group and with each other, and helps them to come forth with their concerns and interests. The Discussion Leader is to guide the discussions so that all the participants have the opportunity to participate and learn what they have come to learn. The Discussion Leader is to prevent any one of the participants from controlling the discussion. Each discussion group lasts for a minimum of 2 hours. Most discussion groups meet on a weekly basis from September through May. Participants in a discussion group neither pay tuition nor receive grades. However, they do register as students at MATC. The subject matter of a discussion group is not offered for credit to any MATC student. Discussion Leaders are paid on the basis of the number of discussion groups conducted and not on a salary basis. Discussion Leaders are not eligible for tenure, fringe benefits, or any other contract *600 benefits at MATC. Each Discussion Leader conducts between 4 and 10 group sessions a week. Joyce conducted about eight discussion group sessions per week and received as compensation from MATC about $25 per session. MATC regularly maintains a staff of 20 Discussion Leaders. A Discussion Leader is a part-time employee regardless of the length of employment. There is no minimum educational requirement for a position as a MATC Discussion Leader other than a high school diploma. A Discussion Leader need not have any prior teaching experience. However, a Discussion Leader must be able to establish rapport with a variety of individuals and be creative in the use of resource materials. A Discussion Leader should be able to work in the community (as opposed to working in a structured kind of setting) and it is preferred that a Discussion Leader have a combination of group work and teaching experiences. All staff at MATC, including Discussion Leaders, are required to participate in ongoing in-service programs. Master of Science Degree
The Department of Educational Psychology (hereinafter sometimes referred to as "the Department") at the University of Wisconsin, Milwaukee (hereinafter *601 sometimes referred to as "the University"), maintains a graduate Counseling and Guidance program (hereinafter sometimes referred to as "the Graduate Program"), for students to pursue a course of study to receive a master of science degree in Educational Psychology. The purpose of the Graduate Program is to prepare graduate students to become school counselors. From 1974 through May 1977, Douglas J. Mickelson (hereinafter sometimes referred to as "Mickelson"), then an associate professor of the Department, was responsible for administering the Graduate Program. From 1974 through 1976, Mickelson was the counseling area chairman in the Department. His responsibilities included reviewing applications to the Graduate Program, admitting students to the Graduate Program, scheduling the sequencing of the Graduate Program, administering the internship program, and recommending to the Wisconsin Department of Public Instruction (hereinafter sometimes referred to as "the WDPI") at the conclusion of an intership program (described, infra) whether the student successfully completed certification requirements. In September 1974, Joyce entered the Graduate Program for a master of science degree *602 in Educational Psychology--Counseling and Guidance. She did so because she believed she should improve her skills and background so as to become a better Discussion Leader. The WDPI, the governing body for Wisconsin's public primary and secondary schools, establishes the requirements for State certification as a school counselor. In order to receive a school counselor-provisional level certification, an individual must obtain a master of science degree in counseling and guidance and either (1) be certified as a school teacher and have taught for 2 years in the area in which the individual is certified as a school teacher or (2) complete a 1 year school counseling internship program (hereinafter sometimes referred to as "the Internship Program"). Joyce is not certified as a school teacher in Wisconsin. Completion of the requirements for a master of science degree in counseling and guidance is a prerequisite to entering the Internship Program. On August 14, 1976, Joyce received a master of science degree in Educational Psychology. The Internship Program
The Internship Program has been in existence since 1968; it is still called an experimental program.The Internship Program was designed *603 to supplant the 2 year teaching experience requirement for certification as a school counselor. The Internship Program was established to attract qualified school counselor candidates who would not normally enter the field of education and are not interested in being classroom teachers. The purpose of the Internship Program is to acquaint the intern with the life and work of a school and to provide to the intern the educational and on-the-job experience necessary to become a certified school counselor. The Internship Program is conducted by the WDPI together with cooperating universities and schools. The WDPI approved the school counselor internship alternative in the counselor education programs of the following five Wisconsin universities (effective with the start of the 1968-1969 school year): (1) the University; (2) University of Wisconsin, Madison; (3) University of Wisconsin, Oshkosh; (4) University of Wisconsin, Platteville; and (5) University of Wisconsin-Stout, Menomonie. Completion of the Internship Program is not a requirement for the master of science degree in Educational Psychology at the University (however, it is a requirement for the degree at the University of Wisconsin, *604 Madison). The Internship Program is an extension of the Graduate Program, with the intern remaining a student for credit at the University during the internship; the Internship Program is administered by the Department. As part of the admissions process to the Graduate Program, the applicant is interviewed; one of the areas discussed at the interview is the applicant's future employment plans. If an applicant indicates an interest in becoming a school counselor but does not have the requisite 2 years of teaching experience and the proper undergraduate teaching preparation, then the Graduate Program interviewer indicates that the Internship Program (which comes after the Graduate Program) is a means of accomplishing the applicant's desired goal. The Department actively solicits schools to participate in the Internship Program. Some of the schools participating in the Internship Program take one intern each year. Other schools are not interested in participating in the Internship Program primarily because of budgetary constraints, combined with the limitations on the participating schools' control over the duties and responsibilities of the interns. Also, some superintendents and *605 principals strongly believe that the only way an individual could work as a school counselor is to have been certified as a school teacher and to have taught 2 years in the teacher's certification subject area. After a school indicates an interest in participating in the Internship Program by "hosting" an intern, representatives of the Department meet with representatives of the school district and explain that there are conditions that must be satisfied. In particular, it is explained that the intern must not supplant a full-time staff member; the intern is to supplement the school district's then-current counseling staff; the intern must be supported by funds in the local district (no funds from Federal categorical grants are to be be used); and there must be on-site supervision. Under the Internship Program, the intern is required to have a "broad range sort of experience"; for example, it is unacceptable for an intern to be assigned to work with a counselor who is working only on college admissions, even though college admissions assistance is what the host school needs. The intern signs a contract with the school district. However, the school district does not have free control *606 over the duties and responsibilities of the intern. In addition, the intern has no obligation for future employment with the school in which he or she serves as an intern, after the intern successfully completes the Internship Program. In Mickelson determines that a school would meet the requirements of the Internship Program, then he writes a letter to the WDPI requesting approval for the school to have an intern. The WDPI either grants approval or, in some cases, requests additional information. Often the school district indicates that it would like to interview several intern candidates. The Department then chooses several interns that would be most likely to fit in with what the school district has indicated as its interest. Under the Internship Program, the Department is responsible for providing "off-site supervision". This consists of visiting each host school at least once a semester, and meeting with each intern and that intern's on-site supervisors in order to monitor the intern's activities so as to ensure that (1) the intern receives a variety of educational experiences and (2) on-site supervision is being provided. The internship consists of work experience as an intern *607 school counselor at a host school for 1 school year, and participation in regular classes at the cooperating university and in seminars at the cooperating university or in the host school district. When the interns return to the University every 2 weeks for classes or seminars, the Department has them meet in supervised sessions to discuss the different types of activity that they participate in. Occasionally, such a session would turn into a support group, where an intern having difficulties at a school could discuss the situation. The WDPI's guideline for payments to an intern is that "[t]he minimum salary to be paid to an intern is approximately $5,200.00 and preferably at least 75% to 80% of the equivalent salary step in the [school] district for someone with comparable training and experience." During 1976 and 1977, the University required that interns be paid and recommended that the amount equal about 60 percent of that paid to beginning guidance counselors. Apart from the Internship Program, school districts are not permitted to hire noncertified school counselors. When the internship is completed, the intern is eligible for school counselor-provisional level certification *608 from the State of Wisconsin. In order to be eligible for professional level certification, the individual must complete 2 years of work as an assigned school counselor, and complete an additional nine credits of graduate work. Joyce's Internship
The University was the cooperating university and it selected Hamilton High School (hereinafter sometimes referred to as "Hamilton") as the site of Joyce's internship. The WDPI approved Joyce's internship at Hamilton and confirmed that Richard Granum (hereinafter sometimes referred to as "Granum") would be Joyce's supervising counselor. Joyce participated in the Internship Program at Hamilton from September 1976 through June 1977. When an intern begins the Internship Program at Hamilton, Hamilton assumes that the intern has the basic skills in counseling. At Hamilton, an intern is first oriented to the school system; the amount of time for orientation varies with the intern. At first, the intern is basically an observer. Hamilton recognizes its obligation to comply with the requirements of the Internship Program and after the orientation period it provides the intern with a full range of experiences, including individual and group counseling, *609 educational training, and work training. Also, depending on his or her maturity, an intern would deal with personal and social problems, including early pregnancies and drug and alcohol abuse and treatment. All of the activities that an intern performs at Hamilton, including establishing programs, must be checked with the intern's direct supervisor. A certified school counselor does not receive the extensive supervision that an intern receives and is not subject to the same restrictions as an intern. Hamilton received the necessary funding to pay an intern from the cooperating university that the intern was from. While Joyce participated in the Internship Program, Hamilton received the necessary funding to pay Joyce from the University. Hamilton was required to give reports as to each intern's progress, to the president of the cooperating university that the intern was from. At Hamilton, an intern is "treated" as a member of the faculty although he or she is not a member of the faculty. Joyce was allowed to participate in Hamilton's medical insurance program. However, she was not covered by the master contract, she was not covered by the union, and she did not receive tenure. *610 During her internship, Joyce was required to be at Hamilton from 8:00 a.m. to 2:30 p.m., Monday through Friday, except on alternate Fridays when she attended a three-hour class beginning at 1:00 p.m. at the University. She was also allowed time off to attend some seminars and meetings. Granum provided daily direct supervision to Joyce. She participated in the full range of counselling activities at Hamilton. Joyce was required to maintain a B average in order to successfully complete the Internship Program. Her grade was determined by the University, with input from Granum. Joyce received 12 credits at the College for completing the internship, including the biweekly classes. There was no employment obligation after Joyce finished her internship either on the part of Joyce or of Hamilton School District. Each school year from 1974-1975 through 1980-1981, there were four certified school counselors working at Hamilton. Hamilton has participated in the Internship Program since 1975. During the 1975-1976 school year, Hamilton had two interns. Joyce was the only intern at Hamilton during the 1976-1977 school year. From the 1977-1978 school year through the 1980-1981 school year, *611 Hamilton has had only one intern. Hamilton's guidance staff could have performed their duties without Joyce. The University certified to the WDPI that Joyce had successfully completed the Internship Program; the WDPI certified her as a "school counselor-provisional level". Joyce received $6,890.05 from Hamilton School District during her internship; $2,223.33 was received in 1976 and $4,666.72 was received in 1977. The amounts Joyce received were not based in any way on her individual financial need. In 1976, Hamilton School District withheld from the amounts paid to Joyce, $254.00 in Federal income tax, $130.05 in Federal Insurance Contributions Act tax, and $75.70 in State or local tax. In 1977, Hamilton School District withheld for these same items $550.40, $272.98, and $163.20, respectively. Joyce spent $1,915.82 in 1976 for education expenses as set forth in Table 1: Table 1 Preinternship Education Expenses
$1,157.50
Internship Program Tuition
368.90
Wisconsin Personal Guidance Ass'n
(training conference)
23.00
National Training & Development Service
Toronto, Canada (training conf.)
366.42
$1,915.82
Joyce spent $448.10 for education expenses in 1977, including $368.90 for Internship Program *612 tuition and $79.20 for transportation. Joyce has been employed by Shorewood High School (hereinafter sometimes referred to as "Shorewood") as a High School Career Experience Coordinator since 1977. At Shorewood, Joyce helps students to think through and plan their future career goals. She reports directly to the principal. Shorewood expects Joyce to have the organizational skills to initiate and maintain her responsibilities, and to perform her responsibilities without direct supervision. Joyce's responsibilities include the following: (1) conducting seminars and discussion groups to introduce the world of work to the students; (2) assisting students to develop and understand career interests; (3) referring students to specific career interests and to jobs; (4) maintaining vacancy listings for jobs of various kinds; (5) soliciting employers to establish career placement opportunities; and (6) making on-the-job visits to evaluate both the students and the employment. * * * As a Discussion Leader at MATC, Joyce's trade or business consisted of teaching and related duties. As a High School Career Experience Coordinator at Shorewood, Joyce's trade or business consists of teaching and *613 related duties. The nature of Joyce's duties and responsibilities as a Discussion Leader, an intern, and a High School Career Experience Coordinator are very similar; all three positions involve the same general type of work. The purpose of the Internship Program was to provide an educational set of experiences for the intern. The Internship Program was of more benefit to Joyce than to Hamilton. OPINION I. Education Expenses
Personal expenses are not deductible, unless the contrary is "expressly provided" in chapter 1 (sec. 262 [3]). Ordinarily, education expenses are regarded as personal. See, e.g., Welch v. Helvering,290 U.S. 111, 115-116 (1933). However, section 162(a)[4]--which is in chapter 1--expressly provides for the deduction of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. As section 162(a) has been interpreted, education expenses may constitute deductible trade or business expenses if the education for which the expenses are made (1) maintains or improves the skills required in the taxpayer's employment or other trade or business, or (2) meets the express requirements of the taxpayer's employer (or of *614 applicable law or regulations) imposed as a condition for the taxpayer to retain an established employment relationship. See, e.g., section 1.162-5(a), Income Tax Regs.
Even though education falls within one or both of the above categories, the expenses therefor are nevertheless nondeductible if the education either enables the taxpayer to meet the minimum educational requirements for qualification in his or her employment or other trade or business (which is not the instant case), or qualifies the taxpayer for a new trade or business. Garwood v. Commissioner,62 T.C. 699 (1974); section 1.162-5(b), Income Tax Regs.
Under section 1.162-5(b)(3), Income Tax Regs., [5] *616 if a taxpayer is pursuing a course of educational study which will qualify *615 him or her for a new trade or business, the expenditures are not deductible even though the studies are required by the employer, even though the taxpayer does not intend to enter the new field of endeavor ( Bodley v. Commissioner,56 T.C. 1357, 1360 (1971)), and even though the taxpayer's duties are not significantly different after the education from what they had been before the education ( Robinson v. Commissioner,78 T.C. 550, 556-558 (1982)). [6] Both sides agree that the education Joyce received in 1976 and 1977, from the Graduate Program and the Internship Program (1) maintained and improved skills required by Joyce in her employment as a Discussion Leader at MATC and (2) was not necessary to meet the minimum requirements for her position as a Discussion Leader *617 at MATC. Respondent maintains that the Graduate Program and the Internship Program were parts of a program of study pursued by Joyce which would lead to qualifying her in a new trade or business. On brief, respondent amplifies his position as follows: The respondent's position is that the examples [of changes in duties which do not constitute new trades or businesses] in Treasury Regulation § 1.162-5(b)(3)(i) which clearly involve minimal changes in duties and responsibilities do not apply to the facts in this case. The respondent contends that the significant changes in duties and responsibilities which accompanied the change from leading part-time, non-credit discussion groups as a community service, to becoming a high school guidance counselor are more in the nature of a change from a paraprofessional to a professional position. SeeDiaz v. Commissioner,70 T.C. 1067, 1075 (1978), aff'd mem.607 F.2d 995 (2d Cir. 1979). That significant shift is not within the same category as those changes in duties set forth in the Treasury Regulations which do involve the same general type of work. Petitioners maintain that Joyce's education expenses in 1976 and 1977 are deductible under section 162(a) *618 because her positions as a Discussion Leader, intern school counselor, and High School Career Experience Coordinator all involve the same general type of work, i.e. teaching, counseling, and guidance. Petitioners argue that (1) the master of science degree in Educational Psychology that Joyce received from the University did not qualify her for anything other than the Internship Program and (2) the Internship Program qualified Joyce for certification as a provisional school counselor in Wisconsin's public school system. Petitioners assert that the position of school counselor does not constitute a new trade or business for Joyce. Thus, petitioners conclude, the education expenses for Joyce's master of science degree and for the Internship Program are deductible since the expenses satisfy the requirements of section 1.162-5(a), Income Tax Regs., and are not rendered nondeductible by section 1.162-5(b), Income Tax Regs.
We agree with petitioners. This Court has adopted a "commonsense approach" in determining whether an education expenditure qualifies a taxpayer for a new trade or business. Reisinger v. Commissioner,71 T.C. 568, 574 (1979); Davis v. Commissioner,65 T.C. 1014, 1019 (1976); *619 Glenn v. Commissioner,62 T.C. 270, 275 (1974). "If the education qualifies the taxpayer to perform significantly different tasks and activities than he or she could perform prior to the education, then the education qualifies him or her for a new trade or business." Browne v. Commissioner,73 T.C. 723, 726 (1980); Diaz v. Commissioner,70 T.C. 1067, 1074 (1978), affd. without published opinion 607 F.2d 995 (CA2 1979); Glenn v. Commissioner,62 T.C. at 275. Whatever may be the standards for "new trade or business" in different types of endeavors, respondent's regulations provide special rules applicable to the instant case; viz, "all teaching and related duties shall be considered to involve the same general type of work. The following are examples of changes in duties which do not constitute new trades or businesses: * * * (c) Classroom teacher to guidance counselor." Section 1.162-5(b)(3)(i), Income Tax Regs.[7] *620 *621 Joyce was employed as a Discussion Leader by the Milwaukee Area Technical College. As a Discussion Leader, she was a part-time member of the faculty of MATC. The Family Program is an adult education program of MATC. Joyce's responsibilities and activities as a Discussion Leader, set forth in detail in our findings of fact, make in plain (and we have so found) that her trade or business can fairly be subsumed within the "teaching and related duties" rubric of respondent's regulations. Joyce's school counseling work at Shorewood consists of teaching and related duties. We conclude that Joyce's work at MATC and her work at Shorewood are more alike than the work of a classroom teacher and a guidance counselor. Accordingly, we conclude that Joyce's education in the Graduate Program and the Internship Program did not qualify her for a new trade or business. In light of the parties' agreements with regard to the other requirements of paragraphs (a) and (b) of section 1.162-5, Income Tax Regs., *622 we conclude that petitioners are entitled to trade or business expense deductions on account of Joyce's education expenditures for these two programs. Respondent contends that Joyce's role as a Discussion Leader at MATC was that of a paraprofessional, that Joyce's role at Shorewood is that of a professional, and that our opinion in Diaz v. Commissioner,70 T.C. at 1075, leads to the conclusion that Joyce became qualified for a new trade or business. We disagree. In Diaz, the taxpayer was employed as an educational assistant, and then an educational associate, in the New York City public school system. Her job was to assist the regular classroom teacher or teachers in the performance of their duties. We pointed out that the taxpayer "was not authorized to assume the complete control and responsibility for the classroom and the instructional activities within it. Moreover, she was not given the primary responsibility for the planning preparation of the instructional activities in the classroom. Accordingly, [we concluded that the taxpayer] did not perform those duties we find essential to the teaching function * * *. Moreover, we do not believe these examples [in sec. 1.162-5(b)(3)(i), Income Tax Regs.] *623 suggest that a shift from paraprofessional to classroom teacher, with the significant changes in responsibility and control that accompany such a shift, is within the same category as those changes in duties that do involve the same general type of work." 70 T.C. at 1075. In contrast, in the instant case, Joyce had the same sort of responsibility and control in her Discussion Leader employment as in her employment as a school counselor. Joyce's work as a Discussion Leader was not an apprenticeship for her work as a school counselor. Diaz does not present an appropriate analogy for the instant case. We hold for petitioners on this issue. II. Internship Program Stipend
Respondent maintains that the amounts Joyce received from Hamilton during the Internship Program represent compensation for services performed and are not properly excludable from income. Alternatively, respondent contends that if these amounts are scholarships or fellowship grants under section 117, then the excludable amount is limited under section 117(b)(2), since Joyce was not a candidate for a degree. Petitioners maintain that the amounts received are scholorships or fellowship grants, and that Joyce was a candidate *624 for a degree and so the entire amount is excludable. We agree in part with each side; we agree with petitioners that the amounts are scholarships or fellowship grants, and we agree with respondent's alternative position that the exclusion is not to exceed the limits applicable to taxpayers who are not candidates for degrees. A. Scholarship or Fellowship Grant
Section 117(a)(1)[8] *625 provides generally that scholarships and fellowship grants are excludable from gross income. Section 1.117-4, Income Tax Regs., provides that amounts paid to "an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity". Section 1.117-4, Income Tax Regs., also provides that "[n]either the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant." However, the terms "scholarship" and "fellowship grant" do not include any amount which "represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor." Section 1.117-4(c)(1), Income Tax Regs.
In Bingler v. Johnson,394 U.S. 741, 751 (1969), the Supreme Court sustained *626 the validity of these regulations stating that: [T]he definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no strings" educational grants, with no requirement of any substantial quidproquo from the recipients. Thus, under these regulations the distinction between compensation for services, and a scholarship or fellowship grant turns on whether the recipient was paid to work or paid to study. Zolnay v. Commissioner,49 T.C. 389, 396 (1968). Determination of the primary purpose of such payments must necessarily "turn upon its own particular facts and circumstances." Steiman v. Commissioner,56 T.C. 1350, 1355 (1971); Zolnay v. Commissioner,49 T.C. at 395. Petitioners have the burden of proving that the amounts received were scholarships or fellowship grants. Olick v. Commissioner,73 T.C. 479, 486 (1979); Rule 142(a). [9]
In making the determination, we acknowledge that we are dealing with another one of those areas of our tax laws where precise line-drawing *627 is often difficult. Olick v. Commissioner,73 T.C. at 486; Zolnay v. Commissioner,supra. Based on the record as a whole, we conclude that the primary purpose of the amounts paid by Hamilton to Joyce was to enable her to study and not to compensate her for services rendered to Hamilton. Hamilton did not require a substantial quid pro quo from Joyce in return for the amounts she received. We conclude that the amounts received by Joyce constituted a scholarship or fellowship grant within the meaning of section 117(a)(1). Our decision rests on several factors, as follows: (1) Under the Internship Program, the host school is forbidden to use the intern to supplant a full-time staff member. Hamilton's staff could have performed their guidance duties without Joyce. (2) The host school is required to provide supervision. (3) Although the host school may be allowed to interview several intern candidates, if it chooses to participate in the Internship Program it must select the intern from among those provided by the WDPI. (4) The host school is required to give the intern a wide range of experience, regardless of the work needs of the host school. (5) Apart from the Intership Program, *628 school districts are not permitted to hire noncertified school counselors. (6) Neither the host school nor the intern is obligated to the other with respect to employment after the intern completes the Internship Program. (7) Although Hamilton School District paid Joyce, it did so with funds provided to it by the University for the purpose of paying Joyce. Respondent contends that petitioners appear to be taking inconsistent positions. The asserted inconsistency is that the education expense deduction must be based on engaging in a trade or business at the time of the expense, while the section 117 grant requires that the taxpayer not be compensated for services. Although currently unemployed, a taxpayer can still be engaged in a trade or business if he or she was previously involved in and actively seeks return to that trade or business. E.g., Furner v. Commissioner,393 F.2d 292, 295 (CA7 1968), revg. 47 T.C. 165 (1966); Ford v. Commissioner,56 T.C. 1300 (1971), affd. 487 F.2d 1025 (CA9 1973). See Reisinger v. Commissioner,71 T.C. at 572; Haft v. Commissioner,40 T.C. 2, 6 (1963). In the instant case, Joyce continued working as a Discussion Leader while attending classes at *629 the University. However, she had to discontinue working at MATC during the Internship Program, because the Internship Program required a full-time commitment, After successfully completing the Internship Program and receiving her certification, Joyce accepted a position as a High School Career Experience Coordinator with Shorewood. Joyce did not abandon her trade or business while she participated in the Internship Program. We hold for petitioners on this issue. B. Candidacy for a Degree
Section 117(b)(2)(B)[10] *630 limits the amount that may be excluded in the case of an individual who is not a candidate for a degree. Joyce received her master of science degree in Educational Psychology from the University in August 1976; she began the Internship Program in September 1976. It is true that Joyce was a student at the University during her participation in the Internship Program, but nothing in the record in the instant case indicates that she was a candidate for a degree at any time after she was awarded the master of science degree in August 1976. We conclude that the limitations of section 117(b)(2)(B) apply in determining the amounts of Joyce's scholarship or fellowship grant exclusions. Petitioners state that the WDPI's certificate to Joyce "is the equivalent of a degree." The certificate referred to is the one certifying *631 Joyce as a "school counselor-provisional level".Petitioners rely on Rev. Rul. 58-338, 1958-2 C.B. 54, and section 1.117-3(e), Income Tax Regs.
Firstly, the statute (n.10, supra) refers to "a degree at an educational institution". The certificate in question is a license to engage in a particular employment and is issued by a regulatory licensing agency. We do not regard the certificate as equivalent to a degree. Secondly, aside from the fact that respondent's rulings are not binding on the Court (e.g., Warsaw Photographic Associates v. Commissioner,84 T.C. 21, 39 n.22 (1985); Burck v. Commissioner,63 T.C. 556, 561-562 (1975), affd. 533 F.2d 768 (CA2 1976)), Rev. Rul. 58-338 does not help petitioners. The ruling merely states respondent's position that an accredited school of nursing's certificate qualifies as an educational institution's degree for purposes of section 117. The critical element of distinction is that the accredited school of nursing referred to in the ruling is an educational institution, while the instant record shows that the WDPI's action in issuing the certificate is essentially an action of a regulatory and licensing body. Thirdly, the cited regulation also *632 merely makes the point that a diploma pr certificate of an educational institution may be equivalent to a degree. Once again, petitioners' argument falls because of a failure to show that Joyce's certificate was issued by an educational institution and that the certificate was not essentially a license. We hold for respondent on this issue. Decision will be entered under Rule 155.
Footnotes
1. The medical expense adjustment as to 1977 is derivative and depends on our resolution of the exclusion issues. ↩
2. Unless indicated otherwise, all section and chapter references are to sections and chapters of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
3. SEC. 262. PERSONAL, LIVING, AND FAMILY EXPENSES. Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses. ↩
4. Section 162(a) provides in relevant part as follows: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *↩
5. Section 1.162-5(b), Income Tax Regs., provides in relevant part as follows: Sec. 1.162-5. Expenses for education. * * * (b) Nondeductible educational expenditures.-- * * * (3) Qualification for new trade or business. (i) The second category of nondeductible educational expenses within the scope of subparagraph (1) of this paragraph are expenditures made by an individual for education which is part of a program of study being pursued by him which will lead to qualifying him in a new trade or business. In the case of an employee, a change of duties does not constitute a new trade or business if the new duties involve the same general type of work as is involved in the individual's present employment. For this purpose, all teaching and related duties shall be considered to involve the same general type of work. The following are examples of changes in duties which do not constitute new trades or businesses: (a) Elementary to secondary school classroom teacher. (b) Classroom teacher in one subject (such as mathematics) to classroom teacher in another subject (such as science). (c) Classroom teacher to guidance counselor. (d) Classroom teacher to principal. * * * ↩
6. The education expense regulation here relevant was promulgated in 1967. It replaced a regulation that had been promulgated in 1958. The "old" (1958) regulation embodied a subjective "primary purpose" test. The "new" (1967) regulation replaces this with an objective test, in particular the qualification-for-new-trade-or-business test, embodied in section 1.162-5(b)(3) (n.5, supra). Taubman v. Commissioner,60 T.C. 814, 817-819↩ (1973).
7. Licensing and certification requirements often are indicators of separate trades or businesses. E.g., Robinson v. Commissioner,78 T.C. 550 (1982) (a licensed registered nurse different trade or business from a licensed practical nurse); Johnson v. Commissioner,77 T.C. 876 (1981)(a licensed real estate broker different trade or business from a licensed real estate agent); Reisinger v. Commissioner,71 T.C. 568 (1979) (a certified physician's assistant different trade or business from a licensed practical nurse); Sharon v. Commissioner,66 T.C. 515 (1976) affd. 591 F.2d 1273 (CA9 1978) (a licensed California attorney different trade or business from a licensed New York attorney); Glenn v. Commissioner,62 T.C. 270 (1974) (a licensed certified public accountant different trade or business from a licensed public accountant). However, respondent's regulations lead to different results for school people in many settings. E.g., Toner v. Commissioner,623 F.2d 315 (CA3 1980), revg. 71 T.C. 772 (1979) (a public school elementary teacher same trade or business as a parochial school elementary teacher); Laurano v. Commissioner,69 T.C. 723 (1970) (a certified teacher in Toronto, Canada, same trade or business as a certified teacher in New Jersey). Since neither side in the instant case contends that this preferential treatment causes the regulations to be invalid in whole or in part, we have no occasion to consider the matter. We take the regulations as we find them. If respondent does not like the result, then he may try to persuade the Treasury Department to change the regulations. See, e.g., Woods Investment Co. v. Commissioner,85 T.C. 274, 282↩ (1985).
8. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. (a) General Rule.--In the case of an individual, gross income does not include-- (1) any amount received-- (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or (B) as a fellowship grant, including the value of contributed services and accommodations; * * * [For taxable years beginning after December 31, 1976, subparagraph (A) reads as follows: "(A) as a scholarship at an educational organization described in section 170(b)(1)(A)(ii)". This change in terminology (resulting from secs. 1901(b)(8)(A) and 1901(d) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1794, 1803) applies to the second of the years before the Court in the instant case but does not affect the analysis herein.]
9. Unless indicated otherwise, all rule references are to the Tax Court Rules of Practice & Procedure.↩
10. SEC. 117. SCHOLARSHIPS AND FELLOWSHIP GRANTS. * * * (b) Limitations.-- * * * (2) Individuals who are not candidates for degrees.--In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply * * * only within the limitations provided in subparagraph (B). * * * (B) Extent of exclusion.--The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e)(4)). [See bracketed material at end of n.8, supra.↩]